44925. COLONIAL PIPELINE COMPANY v. BROWN et al.
44926. COLONIAL PIPELINE COMPANY v. WRIGHT
CONTRACTING COMPANY et al.
(365 SE2d 827)

SMITH, Justice.

This appeal consolidates two related cases stemming from the destruction of a bulldozer after it hit and ruptured Colonial Pipeline's underground petroleum pipeline. The owner of the bulldozer, Wright Contracting Company, sued Colonial, Baxter Brown, the real estate developer who hired Wright to do grading work, and Malcolm Burnsed, the surveyor who did the grading plan. Case no. 44925 is Colonial's appeal from a jury verdict requiring Colonial to indemnify Brown for his expenses incurred in defending this lawsuit. We affirm case no. 44925.

Case no. 44926 is Colonial's appeal from a jury verdict awarding Wright $52,728.46 actual damages, $304.75 consequential damages and $5,000,000 punitive damages. We affirm in part and reverse in part case no. 44926 — the punitive damages award is reversed.

Colonial purchased a right-of-way easement from Reese W. Cross and Eloise H. Cross in 1976. Colonial's pipeline was to be installed on part of their property that faced Westover Road, and it was to run parallel to the road. The property subject to the easement was higher than the road, and the easement required Colonial to bury the pipeline at least thirty inches below the grade of Westover Road.

Baxter Brown, an experienced real estate broker, purchased five acres of land out of a larger parcel owned by the Crosses. The five acres Mr. Brown purchased were subject to Colonial's recorded easement.

Mr. Brown hired Malcolm Burnsed, a registered land surveyor, to survey the property and prepare a boundary line survey and a grading plan.

Although a preliminary title opinion was prepared four days prior to the purchase of the property in December 1981, Mr. Brown asserted that he had not seen it prior to the date the pipeline was ruptured on June 15, 1982. Both the preliminary title opinion and the final title opinion contained identical language: "Right-of-way easement from REESE WILSON CROSS and ELOISE HUCKABEE CROSS to COLONIAL PIPELINE COMPANY, A DELAWARE

CORPORATION, dated August 26, 1976, and recorded in Deed Book 568, pages 329-330, in the aforesaid Clerk's Office."

Neither the boundary line survey nor the grading plan prepared by Mr. Burnsed contained a hint of Colonial's easement. Mr. Burnsed found a warranty deed dated 1966 from L. W. Cross to R. W. Cross in the court records. Because the deed stated that it was "[s]ubject to easements of record," Mr. Burnsed used the grantor/grantee index to determine if there was an easement prior to 1966. He testified that he had looked at the property and did not see any physical evidence of a pipeline, therefore, he had no reason to check to see if an easement had been conveyed after 1966. Mr. Burnsed testified that he did not know that the pipeline was under the property he had surveyed until the pipeline was ruptured.

Mr. Burnsed testified that he did not obtain a copy of the title opinion in preparing his boundary line survey and admitted that the Rules of State Board of Registration for Professional Engineers and Land Surveyors, Section 180-7-.02 provides: "The surveyor prior to making [a boundary line survey] shall acquire all necessary data, including deeds, maps, *certificates of title*. . . ." (Emphasis supplied.)

David James, the area manager for Wright Contracting Company, testified that he did not see any evidence of the pipeline on the property that Wright was hired to grade. He further testified that he did not see the Colonial Pipeline marker that was located 670 feet south of the property. He did indicate that he knew that the pipeline was in the area, but he did not know that it was under the property.

Mr. James stated that if he had known about the pipeline he would not have relied upon the terms of the easement, he would have called Colonial, and they would have located the pipeline for him.

The Wright Contracting Company "Safety Rules Procedure" manual provides in part: "Construction Practices . . . *Excavating and Trenching* operations will include proper safeguards and inspections to *determine location and extent of underground utilities* . . . ." (Emphasis supplied.)

An expert witness, Mr. John Sperry, testified that if he were going to cut a five acre tract out of a larger tract and provide a boundary line survey, he would look *forward* from the 1966 deed to see if any parcels or easements had been deeded out of the property. (If the surveyor had looked forward, he would have found the easement.) In answer to another question, Mr. Sperry testified that if he was hired to do a grade plan and topographical survey that he would ask for the title opinion. (If the surveyor had obtained the title opinion he would have found the easement.) Mr. Sperry indicated that there is no difficulty in securing a map from Colonial Pipeline that shows the location of the pipeline. He testified that the general standards by which one should conform as a surveyor are in Section 180-7-.02 of the

Rules of State Board of Registration for Professional Engineers and Land Surveyors.

The bulldozer operator was grading between eight and nine inches below the level specified in the grading plan when the pipeline was ruptured.

Federal regulations require Colonial to conduct an aerial inspection of the entire pipeline every fourteen days to discover unusual activities. Colonial had contracted with a new aerial patrol contractor on May 1, 1982. He had difficulty finding the line from the air; as a result, only two partial inspections were conducted in the fourteen days preceding the occurrence. The red clay field where Wright was grading was observed by a Colonial employee on a June 11, 1982 flight, but he assumed the activity was farming and failed to report it.

The pipeline was installed approximately 48 inches below the surface of the land; however, it was approximately one and three-quarter inches above the center of Westover Road. Although a marker was located 1,120 feet south of the ruptured line and 670 feet south of the property line and another 2,245 feet north of the rupture at the intersection of Old Dawson Road and Westover Road, there were no markers on the property at the time of the rupture. The distance between the two markers was 3,358 feet. Federal law requires, "[e]ach operator shall place and maintain line markers over each buried line in accordance with the following: (1) Markers must be located at each public road crossing, at each railroad crossing and in sufficient number along the remainder of each buried line so that the location is accurately known."

There was also evidence that six years earlier another construction worker had hit a portion of the pipeline that was on property that was unmarked, but there were no damages.

The jury's verdict exonerated Mr. Brown and Mr. Burnsed and awarded Wright $52,728.46 actual damages, $304.75 consequential damages, and $5,000,000 punitive damages.

1. The section of the pipeline ruptured by Wright's bulldozer was located on the property of appellee Baxter Brown.[1]

2. The appeal of the punitive damages award raises several issues. One is whether or not the complaint sounds in contract or tort. We hold that it sounds in tort, and inasmuch as we are reversing on the punitive damages phase of the case, we will not go into detail as to that point.

3. Colonial challenges the punitive damages element of this case on two grounds, due process and the Eighth Amendment prohibition

---

[1] The jury found that the rupture occurred on Mr. Brown's land, and Colonial appeals this finding. Conflicting evidence was presented as to the location of the rupture. Since the record reflects sufficient evidence to support the jury's finding, we will not overturn it.

against excessive fines contending that this prohibition applies to civil as well as criminal cases. Colonial then asserts that five million dollars in punitive damages violates this amendment.[2]

a. *Ingraham v. Wright*, 430 U. S. 651 (97 SC 1401, 51 LE2d 711) (1977), has been relied upon to find that the Eighth Amendment does not apply to civil cases. But, *Ingraham* dealt only with the cruel and unusual punishment clause of the Eighth Amendment, it did not concern the excessive fines clause. It cannot be viewed as excluding punitive damages from scrutiny under the excessive fines clause of the Eighth Amendment. Moreover, even if *Ingraham* had held that the Eighth Amendment of the United States Constitution applied only to criminal cases, there would be nothing to prevent the application of the excessive fines clause of Art. I, Sec. I, Par. XVII of the 1983 Georgia Constitution to civil cases, thereby affording greater protection under state law.

Justice White writing for the dissent in *Ingraham* stated, "[t]he Court would have us believe . . . that there is a recognized distinction between criminal and noncriminal punishment for purposes of the Eighth Amendment. This is plainly wrong." Id. 686. Justice White cited *Trop v. Dulles*, 356 U. S. 86 (78 SC 590, 2 LE2d 630) (1958) (plurality opinion), for the appropriate test: "The relevant inquiry is not whether the offenses for which a punishment is inflicted has been labeled as criminal, but whether the purpose of the deprivation is among those ordinarily associated with punishment, such as retribution, rehabilitation, or deterrence." *Ingraham*, supra, 430 U. S. at 686-87 (White, J., dissenting).

b. Punitive damages "are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 350 (94 SC 2997, 41 LE2d 789) (1974). In Georgia, when the tortious conduct amounts to "wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences[,]" punitive damages are allowed pursuant to OCGA § 51-12-5 to deter the wrongdoer from repeating his wrongful acts. *Southern R. Co. v. O'Bryan*, 119 Ga. 147 (45 SE 1000) (1903); *Moore v. Thompson*, 255 Ga. 236, 237 (336 SE2d 749) (1985). Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award. *Southern R. Co.*, supra. Punitive damages, although civil in nature, nonetheless serve the criminal law goal of deterrence rather than the traditional compensatory goal of

---

[2] Because we are reversing this case under the excessive fines clause of the Ga. Constitution, Art. I, Sec. I Par. XVII, we are not going to address the due process argument.

civil law.

c. "The applicability of the Eighth Amendment always has turned on its original meaning, as demonstrated by its historical derivation." *Ingraham,* supra at 670-71 n. 39. A review of the history of the excessive fines clause of the Eighth Amendment indicates that it has an origin that was not limited to criminal cases.[3] See Jeffries, J., "A Comment on the Constitutionality of Punitive Damages," 72 Va. L. Rev. 139 (1986); Massey, C., "The Excessive Fines Clause and Punitive Damages: Some Lessons From History," 40 Vanderbilt L. R. 1234 (1987).

Prior to 1215 a system developed whereby a monetary penalty was demanded from one who engaged in either criminal or civil misconduct. The penalty was called an "amercement." The amercement was not levied according to any fixed schedule but was imposed arbitrarily at the discretion of the court. Abuses in the use of "amercements" flourished. The abuses were so pervasive that a great deal of space was devoted to them in the Magna Carta.[4] "Chapter 20 of the Great Charter, the king was made to concede that: A freeman shall not be amerced for a slight offense, except in accordance with the degree of the offense; and for a grave offense he shall be amerced in accordance with the gravity of the offense, yet saving always his 'contenement'; and a merchant in the same way, saving his 'merchandise'; and a villein shall be amerced in the same way, saving his 'wainage' — if they have fallen into our mercy; and none of the aforesaid amercements shall be imposed except by the oath of honest men of the neighbourhood." Jeffries, supra at 155.

"From these three provisions of Magna Carta, two related protections emerge. First, there is a requirement of reasonableness, of pro-

---

[3] "[T]he constitutional prohibition is against cruel and unusual *punishments*; nowhere is that prohibition limited or modified by the langauge of the Constitution." *Ingraham,* 430 U. S. at 685 (White, J., dissenting.) (Emphasis in original.) In comparing the Eighth Amendment with other Amendments of the United States Constitution, we note that the others include limitations. The Fifth Amendment provides, "No person shall be held to answer to a capital, or otherwise infamous *crime* . . . nor shall he be compelled in any *criminal* case to be a witness against himself. . . ." The Sixth Amendment states, "In all *criminal* prosecutions. . . ." In light of the fact that the Eighth Amendment was placed between the Seventh Amendment which provides for trial by jury in *civil* cases and the Ninth Amendment which is a reservation of rights of the people, the absence of any language limiting the Eighth Amendment to criminal cases is especially noticeable. The Georgia Constitution was patterned after the United States Constitution.

[4] "Whatever retrospective characterization one might choose, at the time amercements were not distinctly criminal in nature. This is made abundantly clear by Blackstone, who asserted that '(t)he reasonableness of fines in criminal cases has also been usually regulated by the determination of magna carta, concerning amercements for misbehavior in matters of civil right.' 4 W. Blackstone, Commentaries *372. In this statement, Blackstone consciously distinguished between civil and criminal and correctly identified amercements as a form of civil punishment." Jeffries, supra at 155, n. 65.

portionality, of sensible relation between punishment and offense. Second, the penalty inflicted should not, in any event, destroy the offender's means of making a living in his particular trade or calling. Magna Carta guaranteed not just bare survival, but continued productive economic viability." Id. at 156.

The United States Constitution as originally submitted to the states was criticized for its failure to include a declaration of rights. "Magna Carta and the English Bill of Rights were invoked as models of what was required, and a tacit understanding was reached that some such provisions would be added by way of amendment." Id. at 156. "The Eighth Amendment was based directly on Art. I, § 9, of the Virginia Declaration of Rights (1776) . . . [which] in turn . . . adopted verbatim the langauge of the English Bill of Rights. There can be no doubt that the Declaration of Rights guaranteed at least the liberties and privileges of Englishmen." *Solem v. Helm*, 463 U. S. 277, 285-86 n. 10 (103 SC 3001, 77 LE2d 637) (1983).

d. We hold that the excessive fines clause of Art. I, Sec. I, Par. XVII of the Georgia Constitution applies to the imposition of punitive damages in civil cases because, "the purpose of the deprivation is among those ordinarily associated with punishment, such as retribution, rehabilitation, or deterrence[,]" *Ingraham*, supra, 430 U. S. at 686-87 (White, J., dissenting.), and because the Eighth Amendment excessive fines clause of the United States Constitution was intended as a protection from all excessive monetary penalties.

4. In order to decide what fines are excessive under the excessive fines clause of the Georgia Constitution, Art. I, Sec. I, Par. XVII, a look into the history of torts is necessary.

"Broadly speaking, a tort is a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages." W. L. Prosser and W. P. Keeton, Prosser & Keeton, Handbook on the Law of Torts, p. 2 (5th ed. 1984).

"In the early English law, after the Norman conquest, remedies for wrongs were dependent upon the issuance of writs to bring the defendant into court. In the course of the thirteenth century the principle was established that no one could bring an action in the King's common law courts without the King's writ. As a result of the jealous insistence of the nobles and others upon the prerogatives of their local courts, the number of writs which the King could issue was limited, and their forms were strictly prescribed. There were, in other words, 'forms of action,' and unless the plaintiff's claim could be fitted into the form of some established and recognized writ, he was without a remedy in the King's courts. The result was a highly formalized system of procedure, which governed and controlled the law as to the substance of the wrongs which might be remedied.

"The writs which were available for remedies that were purely

tortious in character were two — the writ of trespass, and the writ of trespass on the case.

"The form of action in trespass had originally a criminal character. It would lie only in cases of forcible breaches of the King's peace, and it was only on this basis that the royal courts assumed jurisdiction over the wrong. The purpose of the remedy was at first primarily that of punishment of the crime; but to this there was added later the satisfaction of the injured party's claim for redress. If the defendant was found guilty, damages were awarded to the successful plaintiff, and the defendant was imprisoned, and allowed to purchase his release by payment of a fine. What similarity remains between tort and crime is to be traced to this common beginning. See Woodbine, The Origin of the Action of Trespass (1923) 33 Yale L.J. 799, (1934) 34 Yale L.J. 343; Maitland, The Forms of Action at Common Law (1941) 65." W. L. Prosser, Cases and Materials on Torts, p. 2 (6th ed. 1976).

"Originally the two remedies [criminal and tort] were administered by the same court, and in the same action. Tort damages were at first awarded to the injured individual as an incident to a criminal prosecution; and as late as 1694 the defendant to a writ of trespass was still theoretically liable to a criminal fine and imprisonment. Because of this common origin, it is not unusual for a tort and a crime to bear the same name, such as 'assault,' 'battery,' 'trespass,' or 'libel,' and often enough such terms will refer to the same conduct. But tort and criminal law have developed along different lines, with different ends in view, and so it does not necessarily follow that the term has the same meaning in both. Thus it is entirely possible that an act may be a tort, but not a crime of the same name, or that it may amount to the crime and not the tort. . . .

"The idea of punishment, or of discouraging other offenses, usually does not enter into tort law, except in so far as it may lead the courts to weight the scales somewhat in favor of the plaintiff's interests in determining that a tort has been committed in the first place. In one rather anomalous respect, however, the ideas underlying the criminal law have invaded the field of torts. Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action 'punitive' or 'exemplary' damages, or what is sometimes called 'smart money.' Such damages are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example. . . .

"Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil

motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross,' a term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched to include the element of conscious indifference to consequences, and so to justify punitive damages. Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort.

"Typical of the torts for which such damages may be awarded are assault and battery, libel and slander, deceit, seduction, alienation of affections, malicious prosecution, and intentional interferences with property such as trespass, private nuisance, and conversion. *But it is not so much the particular tort committed as the defendant's motives and conduct in committing it which will be important as the basis of the award.*" W. L. Prosser and W. P. Keeton, supra, pp. 8-11. (Citations omitted and emphasis supplied.)

Thus it can be seen that the tort law grew out of the criminal law and as such retains some of the elements thereof, to-wit, punitive damages. The word punitive means to inflict punishment.

5. The statute in Georgia that allows an assessment of punitive damages is OCGA § 51-12-5. This statute authorizes a jury to award additional damages to "deter the wrongdoer from repeating the trespass" — the basis upon which the award was made in this case. The code section states that in every tort there may be aggravating circumstances, either in "the act or the intention" in which event additional or punitive damages may be awarded.

In a punitive damage case, the trier of fact must determine: First, was a personal injury or death involved or mere damage to property; and second, was the negligence active or passive. The next step in the determination as to whether punitive damages should be awarded is to decide if there was any evidence of wilful misconduct, malice, fraud, wantonness or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. *Southern R. Co. v. O'Brien*, supra at p. 147.

This case involved personal property damage only. The bulldozer was in an open field, not near any building or residence, and there was no bodily injury to this plaintiff. There was constructive notice to the landowner that Colonial's pipeline was under his property. The surveyor failed to discover the recorded easement, and the bulldozer operator was grading approximately eight or nine inches below the level specified in the grading plan when the pipeline was ruptured. The punitive damages awarded are approximately one hundred times the total of actual and consequential damages.

6. The trial court erred in denying the motion for new trial as to punitive damages. We, therefore, reverse the $5,000,000 award as being excessive because (1) any negligence present was passive; (2) there was no bodily injury to this plaintiff, and the award does not bear a rational relationship to the actual damages award; (3) there is no rational relationship between the offense and the punishment in that the punitive damage award was 100 times the property damage award.

*Case No. 44925. Judgment affirmed. All the Justices concur. Case No. 44926. Judgment affirmed in part and reversed in part. All the Justices concur, except Weltner, J., who concurs specially and Clarke, P. J., Gregory and Hunt, JJ., who dissent as to the reversal of punitive damages.*

WELTNER, Justice, concurring specially.

I concur in the judgment affirming Case no. 44925, and in the judgment reversing the award of punitive damages in Case no. 44926. However, I believe that such a result properly is reached without considering the scope of our state constitution's prohibition of unusual punishments.

The rationale of the opinion is based upon its conclusion that the case "sounds in tort." (Opinion, p. 117.) With that I disagree, in view of the heavy emphasis placed at trial upon the breach by Colonial of its agreement to bury the pipeline at a certain depth. *That* aspect of the claim is, in my opinion, one "arising on contracts" within the meaning of OCGA § 13-6-10. Accordingly, and notwithstanding other particulars of negligence, it cannot support an award for exemplary damages because of the express prohibition contained in the code section.

While the charge in this case reflects a commendable comprehensiveness, it nonetheless failed to advise the jury as to this critically important prohibition. There being an adequate exception to the charge on punitive damages, it is my opinion that a new trial should be ordered on that ground.

CLARKE, Presiding Justice, dissenting.

I concur in the holding of the majority in its affirmance in case number 44925 concerning indemnification and with that part of the majority's holding in case number 44926 relating to actual damages and consequential damages. However, I respectfully dissent to the holding of the plurality of the court and to Justice Weltner's concurring opinion in case number 44926 as it relates to punitive damages. In my opinion, the award of punitive damages by the jury in this case is authorized by law.

In its appeal of the punitive damage award, Colonial contends

the punitive damage statute is unconstitutional, that punitive damages are not authorized in cases of passive negligence and that the award in this case is excessive. Neither the plurality opinion nor the concurring opinion reached all of these issues because they found the case to turn on the issue of excessiveness. Because I believe the verdict is authorized by law, I will undertake to discuss each of Colonial's contentions.

(a) Colonial contends the punitive damage statute violates due process because of vagueness and indefiniteness in its notice to potential defendants and lack of guidelines for the jury in awarding damages. The Georgia statute is brief and forthright. It provides, "In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for wounded feelings of the plaintiff." OCGA § 51-12-5. We have held, "[a] civil statute will withstand an attack of vagueness or indefiniteness if it provides fair notice to those to whom the statute is directed and enables one to determine from the provisions of the Act what the legislative intent was in enacting the Act." *Bryan v. Ga. Public Service Comm.*, 238 Ga. 572, 574 (234 SE2d 784) (1977). By this standard, the statute withstands Colonial's attack. The statute extends fair notice to all those who commit aggravated torts that they stand in danger of the assessment of additional damages. I would not find the legislative intent in the enactment of this statute beyond the understanding of persons of common intelligence.

(b) Colonial also contends OCGA § 51-12-5 violates the constitutional assurance of equal protection, and equal protection analysis requires strict scrutiny of a legislative classification only when the classification interferes with a fundamental right or operates to the peculiar disadvantage of a suspect class. A suspect class is one which has been " 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' " *Massachusetts Bd. of Retirement v. Murgia*, 427 U. S. 307, 313 (96 SC 2562, 2567, 49 LE2d 520) (1976). Colonial does not belong to a suspect class and none of Colonial's fundamental rights has been violated. Applying a less strict standard to Colonial as a non-member of a suspect class, no equal protection violation occurred.

(c) As I understand the plurality opinion, it predicates the reversal of the punitive damage award primarily on the excessive fines clause of the Eighth Amendment to the United States Constitution and of Art. I, Sec. I, Par. XVII of the 1983 Georgia Constitution. The opinion applies this clause to civil actions. I do not agree with this interpretation of the constitutional provision and I believe this places

me in the company of courts who have made earlier visits to these issues. In my view, *Ingraham v. Wright*, 430 U. S. 651 (97 SC 1401, 51 LE2d 711) (1977), was simple and direct in its holding that the Eighth Amendment does not apply to civil cases. Logic supports this position. The Eighth Amendment exists as a protection of citizens against the acts of the national government and not acts of other citizens. The protection of the Eighth Amendment was broadened by the Fourteenth Amendment of the United States Constitution when it extended the protection to acts of the states. *United States v. Kaiser*, 545 F2d 467 (5th Cir. 1977). It is difficult to believe that the plurality chooses to apply the Eighth Amendment to controversies between private parties. Furthermore, it has been held that the conviction of a crime must occur before a party becomes entitled to the protection of the prohibition against cruel and unusual punishment. *Hill v. State*, 119 Ga. App. 612 (168 SE2d 327) (1969).

(d) Colonial characterizes its negligence as passive and argues that punitive damages are not allowed for nonperformance of a duty to keep premises in repair. *Kaplan v. Sanders*, 237 Ga. 132 (227 SE2d 38) (1976). The plurality opinion without explanation refers to the negligence in this case as passive and itemizes this as a reason for finding the award excessive. I cannot agree for two reasons. First, the question of passiveness does not relate to the extent of the award, but only to its justification. Second, the record convinces me that the jury was authorized to find something more than passive negligence. Inflammable gas is an inherently dangerous substance, *Community Gas Co. v. Williams*, 87 Ga. App. 68, 78 (73 SE2d 119) (1952), and due care must be exercised to prevent gas escaping where it might become ignited and cause a damaging explosion. *Bray v. Atlanta Gas Light Co.*, 46 Ga. App. 629 (168 SE 96) (1933). By coupling the above statements with the evidence in this case, I come to the conclusion that the jury was authorized to find the negligence to be more than passive. The negotiating process leading to the execution and delivery of the easement made Colonial aware of the plans to grade and develop the land in question. Nevertheless, Colonial proceeded to install the pipeline at a depth more than 30 inches shallower than the parties had apparently agreed to be safe. Additionally, Colonial stood in violation of federal regulations for its failure to adequately mark the location of the pipeline and to conduct overflights. The jury generally has the right to determine questions of negligence and its determination will not be disturbed upon review except in plain and undisputable cases. *Bussey v. Dawson*, 224 Ga. 191 (160 SE2d 834) (1968). I do not believe this is one of those cases.

(e) There remains the question of whether punitive damages in this case are excessive as a matter of law. Five million dollars is a large sum of money. It far exceeds the limitations ($250,000.00)

placed by the legislature upon awards for punitive damages in causes of actions arising on or after July 1, 1987. OCGA § 51-12-5.1. But the legislature specifically established an effective date for that statute. This then binds us to the law as it existed prior to July 1, 1987. "The question of damages is one for the jury; and the court should not interfere with the jury's discretion unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias." OCGA § 51-12-12. We have held that the amount required to deter future acts depends on the facts of a particular case as determined by the enlightened conscience of an impartial jury. *Smith v. Milikin*, 247 Ga. 369 (276 SE2d 35) (1981). OCGA § 51-12-5, the law dealing with causes of action arising before July 1, 1987, does not authorize our disturbance of the jury verdict in this case.

The plurality opinion attempts to tie the size of a verdict for punitive damages to the compensable injury suffered by the plaintiff. This is a mistaken effort. Compensatory damages and punitive damages have different purposes and stand on different feet. The law authorizes compensatory damages in an attempt to make a damaged party whole. The law authorizes punitive damages to protect all members of the public from a recurrence of the act committed by the defendant. In allowing punitive damages, the law looks not so much to a result of the act as to its egregiousness. The record in this case contains a photograph of the fire erupting from the ruptured pipeline. This photograph demonstrates the enormity of the dangers posed in an incident of this sort. It is indeed fortunate that the rupture and resulting explosion and fire occurred in an open field, but it could have just as well occurred in some other location involving numbers of people. It is against this possibility that punitive damages are imposed as a protecting shield for the public.

I am authorized to state that Justice Gregory and Justice Hunt join in this dissent.

### ON MOTION FOR RECONSIDERATION.

The law of Georgia is that punitive damages are for the purpose of deterring the wrongdoer. Thus, to some degree, it is analogous to a criminal case. In criminal cases there must be a rational relationship between the offense and punishment. For example, one convicted of a misdemeanor would not be sentenced to life imprisonment.

It would be the better practice for the court to instruct the jury to set out the ground or grounds upon which they base their finding that punitive damages should be awarded. The court could easily prepare an interrogatory-type judgment whereby the jury could check off which one or more of the grounds as set out in *Southern R. Co. v. O'Bryan*, 119 Ga. 147 (45 SE 1000) (1903), the defendant was guilty

of violating whereby it called for assessing punitive damages against him. After determining which ground or grounds the defendant violated, then following the three criteria set out in the reversing paragraph above, they could arrive at the amount of punitive damages, if any, to be assessed.

DECIDED MARCH 17, 1988 —
RECONSIDERATION DENIED MARCH 30, 1988.

*Landau, Davis & Farkas, James V. Davis, Neely & Player, Edgar A. Neely III, Ross Arnold, Harold N. Hill, Jr.,* for appellant.

*Mark A. Gonnerman, Hilliard P. Burt, John F. Salter,* for appellees.

*Spearman, Dunham & Gaugher, William L. Spearman,* amicus curiae.