A00A1480. JERRELL v. CLASSIC INSURANCE COMPANY et al.

(541 SE2d 53)

BARNES, Judge.

Michael Jerrell appeals the trial court's grant of partial summary judgment to Classic Insurance Company and Progressive Insurance Company, subsidiaries of the Progressive Companies, in his suit against them for tortious conversion of property. Because some evidence exists in the record from which a jury could infer that the defendants acted maliciously, we reverse the trial court's order.

On appeal from a grant of summary judgment, this Court conducts a de novo review of the record, construing the evidence and all inferences therefrom in favor of the nonmoving party. *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 803 (500 SE2d 591) (1998); *Lane v. Spragg*, 224 Ga. App. 606 (481 SE2d 592) (1997).

Viewed in this light, the record shows that on November 3, 1994, Classic's insured drove into the back end of Jerrell's car, a 1988 Pontiac. Jerrell hit his face on the steering wheel several times and was taken to the hospital. The police towed his car to an impound lot, where Progressive inspected it and declared it a total loss. Jerrell then had the car towed to Williams Body Shop for an independent evaluation. At some point Jerrell retained an attorney to represent him on his personal injury claim, but he was negotiating the property damage claim himself.

On November 22, 1994, Classic adjuster Mark Reid notified the insurance company's total loss unit to pick up Jerrell's car and offered Jerrell $2,225 for the car. Jerrell wanted more money for the car, and negotiations apparently reached an impasse.

In April 1995, Jerrell went to Williams Body Shop to retrieve some personal possessions from the car and discovered that the car had been towed to Classic's subcontractor, Sadisco, sometime previously. The body shop owner testified that, while he did not remember this particular incident, usually a salvage company calls and tells him it has the owner's permission to remove the car, then it does so. He does not contact the owner to verify permission. Jerrell testified that he never gave permission to have the car removed and that he was still "pursuing possibilities" of repairing the car. Adjuster Reid testified that he did not know if he got permission from Jerrell to move the car; while his normal practice was to note in his computer files when he received such permission, no such note appeared in the file and he had no recollection one way or the other.

Melanie Hunter, an insurance adjuster with Classic who also handled Jerrell's claim, testified that company guidelines provided that, once a car is determined to be a total loss, the adjuster should ask the owner for permission to move it.

> Our statement to them is, your vehicle is accruing storage where it's located and that is if it's at a storage-accruing location. We would like to move it to a storage free location, it's still owned by you, it will simply sit there until the paperwork is processed and we come to an agreement. Now if it's at their home and it's not accruing storage, then we tell them that once we agree upon an amount and they have signed the proper documents we will be moving the vehicle.

However, Jerrell testified that Williams Body Shop was not charging him storage fees, and the body shop owner testified that he did not care how long the car stayed at his shop.

In a letter dated April 19, 1995, Jerrell's lawyer wrote a letter to Hunter, first discussing the underlying collision and requesting information about coverage. The attorney then addressed the property claim as follows:

> On a separate issue: As I assume you are aware, Progressive Insurance Company has previously taken possession of Mr. Jerrell's wrecked car and hauled it off to who knows where — without first paying his claim and without obtaining his permission. The car had valuable personal property in it (including, for example, tools utilized by Mr. Jerrell in his computer repair business, an in-car mounting platform for a cellular phone, and various other items), which property, along with the car itself, was also wrongfully taken. These actions clearly constitute tortious conversion of Mr. Jerrell's property. Progressive will be named as a party defendant with respect to the conversion claim. I strongly suggest that someone with Progressive contact me regarding immediately reimbursing Mr. Jerrell for the full value of the car and the various other items of personal property taken by Progressive. I might add that any claim which we assert for conversion of Mr. Jerrell's property will include a claim for punitive damages and for expenses of litigation. Your insured's policy limits (whatever they might be) are irrelevant to such a claim, because it will be asserted against Progressive, not [the insured], and will be based on Progressive's own independent tortious acts. I look forward to hearing from you promptly with respect to both the policy information and with regard [to] prompt reimbursement for Mr. Jerrell's car and the other converted property items.

Hunter responded on April 24, 1995, by sending a copy of the insured's policy and advising Jerrell's attorney to contact Reid, to

whom she had forwarded the letter, regarding the property settlement. Hunter testified that she was not concerned about the conversion allegations in the letter, nor did she consult with the insurance company's in-house counsel about it. In fact, Hunter testified that she found the entire file humorous because Jerrell's lawyer corresponded only with in-house counsel, not with her, even though the in-house lawyer acted at her direction, and she thought Jerrell had been "grossly overpaid in every aspect of the claim."

On May 22, 1995, Jerrell's attorney sent another letter to Hunter, noting that her supervisor indicated she would now be handling both the property and bodily injury claims.

Hunter testified that she next reviewed the file 90 days later, according to her regular schedule, and on August 23, 1995, sent the following letter to Jerrell's attorney:

> This letter is to reiterate our current offer of $2,225.00 to settle your client's property damage claim for his 1988 Pontiac 6000. In addition to this amount, we agreed to cover $396.68 in rental charges even though the State of Georgia Laws allow us to deny rental coverage or loss of use in the case of a total loss vehicle. Sadisco Storage has recently advised me that they are currently charging $1 per day since February 22, 1995, due to the length of time this vehicle has been in storage. This letter is to advise you that if this offer is not accepted as of August 28, 1995, this $1 per day will come out of your client's settlement amount. Please discuss this matter with your client and contact me at your earliest convenience.

On August 29, 1995, Hunter sent another letter to Jerrell's attorney, advising that Jerrell's car would be moved to his home address on September 8, 1995, unless the parties made other arrangements. On August 30, 1995, the attorney representing Classic's insured corresponded with Jerrell's attorney, confirming a conversation five days earlier in which the insured's attorney told Jerrell's attorney where the car was located and invited Jerrell to collect from the car whatever personalty he needed.

After more letters were exchanged among the parties, Hunter sent a letter to Jerrell's attorney on September 15, 1995, reiterating that if she did not hear from him within four days, the company would move the car to Jerrell's home. She further advised Jerrell's attorney to deal with her, not the insured's attorney, who "while handling the legal aspects of this claim, does not have any authority as far as payment or decision-making goes." Finally, Hunter stated in her letter that the company had tried several times to return Jerrell's

car to him but he would not cooperate, but in deposition she admitted that the only time the company mentioned returning the car to Jerrell was in the August 23, 1995 letter.

The next communication from Hunter to Jerrell's attorney was a letter dated September 22, 1995, acknowledging receipt of a letter advising her to move Jerrell's car back to Williams Body Shop. The letter continues:

> Progressive has paid all tow and storage fees which have incurred [sic] since the date of this accident to Sadisco Salvage Company. The salvage value, along with the additional storage that Mr. Jerrell is responsible for, will be deducted from the final settlement amount. This letter is to advise you that I continue to refute your allegation that Progressive "stole" Mr. Jerrell's vehicle. As far as the inventory of Mr. Jerrell's vehicle goes, we will not be attending this meeting, as we have completed our own inventory of the items in Mr. Jerrell's vehicle.

Hunter testified that she physically examined the car on September 20, 1995, at Sadisco's lot. Photographs of the car showed that the bumper had been removed and placed in the trunk, and a water pump was in the backseat. She found no personal possessions in the car, except a computer chip on the front seat. Jerrell testified that, when the car was returned to Williams Body Shop, the exhaust system, the rear bumper, rear light assemblies, and the trunk lock had been removed from the car and placed in the trunk or on the backseat. Missing from the car were personal items that had been in the car when he last saw it at Williams Body Shop, before Classic towed it away.

Hunter testified that, while she understood that Jerrell was claiming that personalty had been taken from his car, she "was not taking that seriously." When asked why not, she responded that she "did not believe there was anything in that vehicle at the time it was towed or moved or whatever." She based that belief on her assessment of the car when she inspected it at Sadisco's lot in September 1995, stating that:

> I was basing a lot of how I felt about the worn places in the seats and the tears in the carpet and et cetera and the bald tires and the poor paint job on the vehicle and all that. So yes, I was basing all of that on the fact that it was not taken care of. . . . Well, to me personally I think that if a person has great care of feeling for personal items as he alleged that he did that would incorporate into everything he owned

including the car. So if I look at a car that's not taken care of then I do make assumptions that probably the house was not taken care of and the personal items, et cetera, et cetera. And maybe I shouldn't make those assumptions, but I do and I did. So, no, I didn't take it seriously.

Classic eventually paid Jerrell the policy limits of $15,000 for his entire claim, $3,750 of which was allocated to the property damage.

"To authorize the imposition of punitive damages, there must be evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences." (Punctuation omitted.) *Ford Motor Credit Co. v. Spicer*, 144 Ga. App. 383, 387 (3) (241 SE2d 273) (1977); OCGA § 51-12-5.1 (b). In *Ford Motor Credit Co. v. Spicer*, supra, we affirmed a jury verdict awarding punitive damages, concluding that the jury was authorized to consider those damages when a creditor continued to hold a debtor's automobile even after learning that it erred in crediting payment to the wrong account. Similarly, we reversed summary judgment to a bank on a punitive damages claim in a case in which the bank continued to hold collateral and unrelated personal property even after it dropped its claim for storage costs and attorney fees. *Keasler v. Cedar Bluff Bank*, 162 Ga. App. 57 (290 SE2d 150) (1982).

We conclude that evidence in this case that Progressive took Jerrell's vehicle without his permission, demanded storage fees after wrongfully taking Jerrell's vehicle from a location that was not charging storage, and of the callous disregard of Jerrell's rights as shown by Hunter's letters and deposition testimony is sufficient to present a jury question regarding punitive damages. *Keasler v. Cedar Bluff Bank*, supra; *Ford Motor Credit Co. v. Spicer*, supra.

*Judgment reversed. Johnson, C. J., Pope, P. J., Eldridge and Phipps, JJ., concur. Blackburn, P. J., and Smith, P. J., dissent.*

BLACKBURN, Presiding Judge, dissenting.

I must respectfully dissent because I agree with the trial court that Jerrell has failed to produce clear and convincing evidence that the insurance companies' actions were so egregious as to warrant an award of punitive damages.

As a prerequisite to punitive damages, OCGA § 51-12-5.1 (b) requires that Jerrell present clear and convincing evidence that the insurance companies' actions "showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." By reversing the partial grant of summary judgment to the insurance companies, the majority must impute evidence of wilful

misconduct despite the fact that Jerrell failed to ask that his totaled car be returned. There was no dispute that Jerrell's car was totaled; the only dispute surrounded the worth of the car at the time of the collision. We cannot ignore the normal course of negotiations of this kind. We cannot impute a bad motive or conscious indifference on the insurance companies' actions when it is unusual for a claimant to want a totaled car. Tony Adamson, of Williams Body Shop, deposed that this was the first time in 14 years of business that an owner was upset because a totaled car had been towed away. It is generally to everyone's benefit to minimize storage expenses. Additionally, there is no evidence in the record of Jerrell asking for the car back. In fact, the evidence in the record indicates that it was the insurance companies who offered to deliver the car to Jerrell's home, only to have Jerrell demand that the car not be delivered there. Almost two weeks later, Jerrell's attorney finally informed the insurance companies where to take the car.

The present case is similar to the facts in *Lamb v. State Farm &c. Ins. Co.*[1] Therein, Lamb sued State Farm for allegedly converting his totaled car after it was towed from the wrecker service yard where it was being stored. Although the insurance claims representative testified that Lamb had consented to the removal of his car, he refuted that he had done so. Initially, State Farm asserted that it would not return Lamb's car until Lamb paid $193 to reimburse certain expenses. State Farm eventually returned the car to Lamb's home. Id. at 365. The trial court directed a verdict on Lamb's claims for punitive damages, and Lamb appealed. On appeal, this Court determined that "because Lamb failed to offer any evidence to prove egregious misconduct on the part of State Farm, a directed verdict was appropriate." Id. at 366 (2).

Similarly, in the present case, the majority relies on the facts that the insurance companies took Jerrell's vehicle without his permission, retained the vehicle and demanded storage fees. However, as we previously held in *Lamb*, such facts do not support the imposition of punitive damages. Additionally, in *Lamb v. Salvage Disposal Co.*[2] (physical precedent only), a second law suit based upon the same facts found in *Lamb v. State Farm*, supra, this Court determined that where the insurance company returned the totaled car remains prior to filing an answer, there could be no damages for conversion when the damage to the car prior to the alleged conversion was in excess of the fair market value of the car. In essence, the car was a total loss before the alleged conversion, and it was still a total loss after the

---

[1] *Lamb v. State Farm &c. Ins. Co.*, 240 Ga. App. 363, 366 (2) (522 SE2d 573) (1999).
[2] *Lamb v. Salvage Disposal Co.*, 244 Ga. App. 193 (535 SE2d 258) (2000).

conversion. *Lamb v. Salvage Disposal Co.*, supra at 196.

The cases cited by the majority are clearly distinguishable from the facts of this case. In *Ford Motor Credit Co. v. Spicer*,[3] the plaintiff sought damages for conversion of his operational vehicle after the bank wrongfully repossessed it due to an error in crediting the plaintiff's account. This Court affirmed the denial of the bank's motion for judgment notwithstanding the verdict, finding, in part, that a jury was authorized to award punitive damages based upon evidence that the bank was aware that the plaintiff had paid all sums due immediately after the repossession but did nothing to remedy the situation. Id. at 387-388. Such a case is entirely different from an insurance company that is negotiating a claim on a totaled vehicle, which would have to be retitled by the state, prior to use. Additionally, in *Keasler v. Cedar Bluff Bank*,[4] cited by the majority, a bank's errors in handling its collection of a note, its failure to collect on the disability insurance provided and its maintenance of a suit against the debtor even after knowledge of its errors provided sufficient evidence for the reversal of the trial court's order granting summary judgment to the bank on the issue of punitive damages. Again however, such facts are not remotely similar to the facts of the present case.

The facts of the present case do not support the imposition of punitive damages. See *Lamb v. State Farm*, supra; *Lamb v. Salvage Disposal Co.*, supra. "Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award." *Colonial Pipeline Co. v. Brown*.[5] Additionally, something more than the commission of an intentional tort is always required.

> There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton.

(Punctuation omitted.) *Cullen v. Novak*.[6] Further, "conscious indifference to consequences relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights." (Punctuation omitted.) *Petrolane Gas Svc. v. Eusery*.[7]

In the present case, there is no evidence to support Jerrell's con-

---

[3] *Ford Motor Credit Co. v. Spicer*, 144 Ga. App. 383 (241 SE2d 273) (1977).

[4] *Keasler v. Cedar Bluff Bank*, 162 Ga. App. 57 (290 SE2d 150) (1982).

[5] *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (3) (b) (365 SE2d 827) (1988).

[6] *Cullen v. Novak*, 201 Ga. App. 459, 460 (2) (411 SE2d 331) (1991).

[7] *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 861 (1) (389 SE2d 355) (1989).

tention that the insurance companies consciously and deliberately disregarded his interest to the extent that their conduct was wilful or wanton. As the trial court correctly determined that Jerrell had failed to present sufficient evidence warranting punitive damages, I would affirm its decision.

I am authorized to state that Presiding Judge Smith joins in this dissent.

DECIDED OCTOBER 16, 2000 —
RECONSIDERATION DENIED OCTOBER 31, 2000.

*Philip S. Cole*, for appellant.
*Downey & Cleveland, Rodney S. Shockley*, for appellees.