BENHAM, Justice,
dissenting.
For the reasons set forth below, I respectfully dissent to the majority opinion.
1. The appropriate punishment for juvenile offenders has been an evolving area of the law for the past decade. Beginning in 2005, the United States Supreme Court held that juvenile offenders could not receive the death penalty. Roper v. Simmons, 543 U. S. 551 (125 SCt 1183, 161 LE2d 1) (2005). Five years later, in Graham v. Florida, 560 U. S. 48 (130 SCt 2011, 176 LE2d 825) (2010), the United States Supreme Court held that a juvenile offender who had not committed a homicide could not be sentenced to life without parole. In 2012, the United States Supreme Court struck down mandatory sentences of life without parole for juveniles who had committed homicide. Miller v. Alabama, 567 U. S. _ (132 SCt 2455, 183 LE2d 407) (2012). Roper, Graham, and Miller are all predicated on the fact that juveniles, who are biologically and emotionally immature, are less culpable than adults for their actions.[7] As the law now stands under Miller, lower *554 courts must exercise discretion when considering whether to impose a life sentence without parole for a juvenile offender who has committed homicide.
Georgia’s law in regard to homicide and sentencing has also undergone some change in the last decade. In April 2009, the General Assembly enacted Ga.L. 2009, p. 223, § 1 which amended OCGA § 16-5-1 to add the sentence of life in prison without the possibility of parole as one of the punishments for murder.* ****[8] See OCGA § 16-5-1 (e) (1). Prior to April 2009, the sentence of life without parole was not a sentencing option for any defendant, regardless of his age, in a non-capital murder case. See State v. Ingram, 266 Ga. 324 (467 SE2d 523) (1996) (the sentence of life without parole is only available in those cases in which the State seeks the death penalty). Given the United States Supreme Court’s holding in Roper, supra, had Bun committed his crimes between 2005 and April 2009, rather than in 2011, the only available sentence would have been life with the possibility of parole. See Moore v. State, 293 Ga. 705 (2) (749 SE2d 660) (2013). There is nothing in the legislative history of the 2009 amendment to OCGA § 16-5-1 indicating that the legislature considered, researched, or analyzed the propriety or impact of life without parole sentences on juvenile offenders who commit homicide.[9]
While it is clear that federal law allows life without parole sentences to be exacted on juvenile offenders who commit homicide as a matter of judicial discretion, the federal law does not prohibit this state from disallowing such sentences for juvenile offenders as a matter of state constitutional law. “It is a well-recognized principle that a state court is free to interpret its state constitution in any way *555 that does not violate principles of federal law, and thereby grant individuals more rights than those provided by the U. S. Constitution.” Powell v. State, 270 Ga. 327, 331, n. 3 (510 SE2d 18) (1998). Indeed, on many occasions this Court has held that the Georgia Constitution affords our citizens broader rights than the federal constitution. See, e.g., Statesboro Publishing Co. v. City of Sylvania, 271 Ga. 92 (2) (516 SE2d 296) (1999) (Georgia Constitution affords broader free speech protection than the First Amendment of the U. S. Constitution); Grissom v. Gleason, 262 Ga. 374, n. 1 (418 SE2d 27) (1992) (Georgia Constitution’s equal protection provision may provide greater rights than U. S. Constitution); Green v. State, 260 Ga. 625, 627 (398 SE2d 360) (1990) (Georgia Constitution provides broader protection than U. S. Constitution for right against self-incrimination); Fleming v. Zant, 259 Ga. 687, 690 (386 SE2d 339) (1989) (Georgia Constitution provides greater protection against cruel and unusual punishment than U. S. Constitution); Colonial Pipeline Co. v. Brown, 258 Ga. 115 (3) (365 SE2d 827) (1988) (Georgia Constitution provides greater protection against excessive fines and forfeitures than U. S. Constitution).
In Georgia, we treat juveniles differently than adults as evidenced by our institutions (i.e., juvenile courts) and laws. See, e.g., OCGA § 17-10-14 (a) (requiring juveniles who are sentenced to life in prison and who are younger than 17 to serve their time in a juvenile detention facility). As a state constitutional matter, we give up nothing by leaving open for juvenile offenders the possibility of rehabilitation and redemption for crimes they commit when they are biologically and emotionally immature. Indeed, life with the possibility of parole is not a “light” sentence for a juvenile offender. A person sentenced to life with the possibility of parole in this state must serve 30 years in prison before becoming eligible for parole. OCGA § 17-10-6.1 (c) (1). Eligibility for parole does not mean a person will be released, but simply means the person may be considered for release by the State Board of Pardons and Paroles. Aperson very well could spend the entirety of his natural life in prison while being parole-eligible in this state.
Here, in addition to his life sentence without parole, Bun has been sentenced to serve a consecutive term of 70 years. Thus, even if parole eligibility was not at issue, the State has ensured that this young man will be a prisoner well into his eighties. Imposing such exorbitant sentences on juvenile offenders means we have given up all hope for their rehabilitation. This is in direct odds with the *556 observation in Roper that “juvenile offenders cannot with reliability be classified among the worst offenders.” 543 U. S. at 569.[10]
Accordingly, because I believe it constitutes cruel and unusual punishment under our state constitution to impose the sentence of life without parole on a juvenile offender who commits homicide, I cannot join the majority opinion.* [11]
2. In addition to the constitutionality of the sentence imposed, I write because the testimony of Tracy Graham-Lawson is deeply troubling whether or not an ethical violation occurred regarding her former status as a juvenile court judge for Clayton County. I believe counsel was deficient when he failed to object to her testimony at the sentencing hearing and that such deficiency was prejudicial to Bun.
Lawson, who was never tendered as an expert, was allowed to testify, among other things, that Bun began his “criminal career”[12] at the age of ten, that she had Bun detained at the age of 13 because she was afraid of him, and that no one could change his behavior patterns. Although Lawson was no longer a juvenile court judge with any authority over Bun after December 2008, she was also allowed to testify about incidents occurring after her judicial tenure and for which she could not possibly have first-hand knowledge.[13] Lawson called Bun a “menace to society,” she said that Bun “scared [her] from the very beginning,” and opined, “You can’t change this young man, I’m convinced of it.” Lawson also said she knew the victim, said the victim was “a wonderful human being,” and said she disqualified herself from prosecuting Bun in the instant case because she believed she could not be impartial.
Whether or not allowing Lawson to testify was a technical violation of judicial ethics, her testimony certainly had the appearance of impropriety inasmuch as Lawson was given a platform, under the guise of her professional status as a former juvenile court judge, to give her personal opinions about Bun while simultaneously admitting she could not be impartial where Bun was concerned. The fact *557 that Lawson was no longer a judge at the time of her testimony does not mitigate the prejudicial effect the weight of her opinions had on the outcome of Bun’s sentencing. Indeed, I can think of no case where a former judge has testified against a defendant in a current criminal proceeding and essentially testified as to her personal opinion on the defendant’s predilection for criminality. When a defendant has a prior criminal record, we allow the certified copy of that prior record to speak for itself. We do not allow former prosecutors, former defense attorneys, and former judges involved in the prior case to testify about a defendant’s character for sentencing purposes or otherwise.
Decided February 16, 2015.
Jimmonique R. S. Rodgers, Christopher R. Geel, Long D. Vo, for appellant.
Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Erman J. Tanjuatco, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant Attorney General, for appellee.
I believe the fact that counsel made no effort to prohibit Lawson from testifying rose to the level of constitutionally ineffective assistance such that Bun is entitled to relief. Accordingly, I cannot join the majority opinion.
I am authorized to state that Justice Hunstein joins in this dissent.

 Dr. Peter Ash, a psychiatrist who was tendered as an expert in juvenile culpability during the proceedings against Bun and who had contributed to briefing submitted in Roper and Graham, testified in pertinent part as follows:
Q. And is the juvenile, is he as culpable as an adult?
A. Generally speaking, no.
Q. And what’s the reason for that?
A. Well there are a lot of reasons. The Supreme Court sort of has parched it out into three main ones which I think are useful to think about.
The first is that adolescents are impulsive and immature and we know this both from behavioral studies and the behavioral studies are kind of supported by a lot of work in neuro-biology and brain scanning that’s been done more recently than that.
*554 And we know a fair bit about how that progresses through adolescence and [in] particular that adolescents tend to be much more focused on immediate rewards and pay less attention to risk.
Also we know under conditions of emotional stress],] their decision making gets appreciably worse than what happens to adults.

 The bill also repealed OCGA §§ 17-10-31.1 and 17-10-32.1, thereby removing requirements that a jury find an aggravating circumstance before imposing the sentence of life without parole (OCGA § 17-10-31.1) and removing the sentencing duties of a judge regarding a person who pled guilty to an offense for which the death penalty or life without parole could be imposed (OCGA § 17-10-32.1). See Ga. L. 2009, p. 223, § 5.

 The likely impetus for the amendment to OCGA § 16-5-1 was the costs to this state for pursuing the death penalty against courthouse shooter Brian Nichols, an adult offender who was ultimately sentenced to life in prison without parole. See Death Penalty Information Center, Smart on Crime: Reconsideration of the Death Penalty in a Time of Economic Crisis, p. 13 (October 2009) (death penalty prosecution of Brian Nichols cost the state approximately $2 million, making it difficult for the state to provide funding for indigent defense in other cases). See also Ga. L. 2009, p. 223, § 5/SB 13 (purpose of amendment is “to provide for the imposition of life without parole of persons convicted of murder independently of a death penalty prosecution”).

 Indeed, Dr. Ash also testified: “We don’t make, for example, diagnosis of anti-social personality in adolescents, you have to wait until they’re 18. Part of that is or what goes along with that is we really cannot predict what someone, even a severe offender, an adolescent, is going to be like as an adult.”

 Such a result is not precluded hy Foster v. State, 294 Ga. 383 (11) (754 SE2d 33) (2014) because that case did not address whether a life sentence without parole for a juvenile offender is cruel and unusual punishment under our state constitution, but was decided solely on federal constitutional grounds. Here, appellant has clearly raised a state constitutional issue.

 Bun’s juvenile record was comprised of carrying a knife to school, trespass, drug and alcohol abuse, running away from home, and burglary. He also was affiliated with a gang and had some physical altercations with his siblings.

 For example, Lawson was allowed to testify, without objection, about an incident that occurred in South Carolina over a year after she had left the juvenile court.