## 75443. ASSOCIATED HEALTH SYSTEMS, INC. v. JONES.
### (366 SE2d 147)

BIRDSONG, Chief Judge.

The Crestview Nursing Home appeals from the judgment of the trial court, entered on a jury verdict, for plaintiff Ernest Jones, administrator of the estate of D. L. Jones. In May, 1985, Leon Phillips and D. L. Jones were "intermediate" residents of the Crestview Nursing Home, who required some supervision, but not "around the clock nursing supervision." On the morning of May 24, 1985, a nurse's aide making rounds at approximately 7:15 a.m. found D. L. Jones had been beaten. Jones said Phillips had beaten him. Phillips had a history of prior altercations with other patients in the nursing home. In July 1984, in the TV room, Phillips had struck Mr. Appling with his open hand. Previous to that assault, Phillips had been involved in "verbal aggression. . . ." David Copple, a psychologist and social worker at Crestview, said he talked with Phillips about why this was unacceptable behavior. On April 8, 1985, Phillips hit Mr. Harper, another resident, with a shoe when Harper cursed while they were watching television. Harper was taken to the hospital for observation and Phillips was taken to the "South Mental Health" clinic for evaluation. A psychiatrist prescribed "one milligram of Haldol" which they frequently gave to patients because "[i]t tends to calm patients down. It tends to make them less verbally aggressive . . . it tends to slow them down." Phillips was returned to Crestview after spending 20 to 30 minutes with the psychiatrist. Copple also took Phillips to see the psychiatrist again on April 15th.

On May 2, 1985, Phillips had a second altercation with Harper, his roommate, and struck him. Harper sustained no injuries but was moved out of Phillips' room. The following day, May 3, Copple again took Phillips to South Mental Health for another evaluation. The psychiatrist ordered an increase in the dosage of Haldol from one milligram to two, and recommended that Phillips' family be asked to visit him more often.

On May 24, after Jones had been beaten by Phillips, Jones was taken to the hospital. He died four days later, apparently due to natural causes and not as a result of the beating by Phillips. Crestview had documented these incidents so that they were known to Phillips' personal physician when he visited him. After the incident on May 24 involving Jones, Phillips was taken to South Mental Health and they recommended his transfer to the Georgia Regional Hospital. After his transfer to that hospital, they attempted to return him to Crestview and Crestview refused to accept him.

Crestview had a psychiatrist on its staff who visited the facility once each week, but Copple never discussed Phillips with him or sought his advice on this matter. No restraint, isolation, or transfer of

Phillips was recommended by anyone at Crestview or South Mental Hospital until May 24 when the clinic recommended his transfer to the Regional Hospital.

Appellee brought this action on a negligence theory, seeking special, general, and punitive damages. The jury returned a verdict in the amount of $782 in special damages, $50,000 general damages, and $200,000 in punitive damages. Crestview's motion for new trial was denied and they filed this appeal. *Held*:

1. Crestview contends the trial court erred in denying its motion for new trial since there was no evidence of negligence because its ability to control Phillips was limited by Title 31, Chapter 8, Article 5. We agree that Article, OCGA § 31-8-100 et seq., known as the "Bill of Rights for Residents of Long-term Care Facilities," does restrict a nursing home in actions it can take in restraining a resident, thus inhibiting its ability to protect other residents from an aggressive resident. It provides, inter alia: "(a) Each resident shall be free from actual or threatened physical restraints, isolation, or restrictions on mobility within or outside the facility grounds, including the use of drugs to limit mobility, except to the minimum extent necessary to protect the resident from immediate injury to the resident or to others. In no event shall restraints, restrictions, or isolation be used for punishment, incentive, behavior conditioning or modification, or for the convenience of the facility. (b) Restraints, restrictions, or isolation shall be used only subject to the following conditions: (1) Prior to authorizing restraints, restrictions, or isolation, the attending physician shall make a personal examination and individualized determination of the need to use such restraints, restriction, or isolation on that resident and shall specify a reasonable time for such use. . . .. (2) In an emergency situation, restraints, restrictions, or isolation shall be authorized by the person in charge only to protect the resident from immediate injury to the resident or others and shall not be continued for more than 12 hours after the onset of the emergency without personal examination and authorization by the attending physician. . . ." OCGA § 31-8-109. We note that these proscriptions are addressed solely to control by use of "physical restraints, isolation, or restrictions on mobility." See caption of OCGA § 31-8-109. The caption shows the legislative intent that in the use of the word "restriction," its intent was to use it in the sense of a "restriction[] on mobility." *Sovereign Camp W.O.W. v. Beard*, 26 Ga. App. 130, 131 (105 SE 629).

Hence, this statutory guidance does not encompass other forms of supervision, counseling, therapy, or restriction *from* access to specified areas, i.e., the TV room. This form of "restriction" *from* an area is not the type proscribed — "restriction" *to* a specified area — i.e., a bedroom. Restriction *to* a designated area is a restraint on mobility of

the resident and in effect isolates the resident. This is prohibited. A restriction *from* an area where friction between the residents tends to develop, i.e., the TV room, exercise room, or even the dining room, may be used by management as necessary as an aid in behavioral control, since it does not isolate or restrain the mobility of the resident from other areas of the grounds and is not a form of physical restraint. Additional or increased observation or supervision over a resident is not proscribed. Relocation of the resident to an area of increased staffing or supervision is an alternative form of behavior control. The use of counseling by staff and family members, or physical therapy for an aggressive resident is permissible. If a resident develops a history of aggressive behavior, the resident's personal physician should be asked for specific recommendations, and if the nursing home is dissatisfied with his recommendations, it can consult its resident doctor or psychiatrist for directions on permissible behavioral control of an aggressive resident. This list is not intended to be all inclusive or exclusive on permissible behavioral controls, but is indicative only of alternative forms of management of an aggressive patient in a nursing home, as contrasted to those proscriptions of OCGA § 31-8-109. The mere fact that a doctor, psychologist, or psychiatrist, has not volunteered to authorize the forms of restraints of OCGA § 31-8-109 does not discharge the duty of a nursing home to exercise "reasonable care and skill" for the care and protection of its residents from a physically aggressive resident. See OCGA § 31-8-108.

The care of aged persons in our society is a matter of great public concern. Many of our elderly require some, if not constant, care or supervision. And, where members of their family are unable to provide such attention, nursing home care sometimes is the only reasonable alternative. Governmental supervision of nursing homes has revealed that many are underfinanced, understaffed, and overcrowded. Residents therein, because of their age or ill health, or both, often are weak, frail, and susceptible to abuse and injury. Some residents have mental health problems as well as physical problems and may not be fully competent to manage their affairs, their daily activities, or to protect themselves from physically aggressive residents. Some residents are irritable, paranoid, belligerent, combative, and are capable of inflicting physical harm upon other aged residents. Nursing homes are not insurers of the safety of their residents, but owe them the duty of ordinary care to protect them from danger or injury which can reasonably be anticipated from the acts of other residents. *Bezark v. Kostner Manor*, 172 NW2d 424 (Ill. 1961); see also *Shockley v. Zayre of Atlanta*, 118 Ga. App. 672, 674 (165 SE2d 179); see generally 7 CJS 186-187, Asylums, § 14; 40 AmJur2d 877, Hosp. & Asylums, § 36. If there is a known hazard or danger, there must also be a corresponding increase on the part of the nursing home in care and super-

vision to prevent injury to a resident. *Bezark,* supra at 426.

Generally, a person does not have a duty to control the conduct of another person, who is a potential tortfeasor, so as to prevent that person from harming a third person (*Bradley Center v. Wessner,* 161 Ga. App. 576, 580 (287 SE2d 716)), unless "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." Restatement, Torts 2d, § 315. In the context of a nursing home, over and above the contractual obligation the nursing home assumed to take care of its residents, the State has imposed a statutory obligation for it to exercise "reasonable care and skill." OCGA § 31-8-108. Hence, not only does the nursing home owe the contractual and statutory duty of care and protection to its residents to prevent harm to them, it owes the duty of supervision over any known resident whose propensity to cause harm to others is known or should have been known to the management. *Bezark,* supra at 426; see also *Rum River Lumber Co. v. State,* 282 NW2d 882 (Minn. 1979); *Sylvester v. Northwestern Hosp.,* 236 Minn. 384 (53 NW2d 17). The general standard of care required of a nursing home is that degree of care, skill, and diligence usually exhibited by such homes generally in the community. *Brown v. Univ. Nursing Home,* 496 SW2d 503, 509 (Tenn. App. 1972); *LeBlanc v. Midland Nat. Ins. Co.,* 219 S2d 251, 253 (La. App. 1969); *MacAlpine v. Martin,* 205 S2d 347, 349 (Fla. App. 1967); see Annot. 83 ALR2d 971, Patient Tort Liability of Nursing Homes.

In order to recover, the appellee had to show that appellants failed to do something which a reasonable person, guided by the above considerations which ordinarily regulated the conduct of affairs of a nursing home, would have done, or ought to have done, and failed to perform such responsibility. See *Tolbert v. Tanner,* 180 Ga. App. 441, 443 (349 SE2d 463). As a result of the relationship of a nursing home to a resident, appellant owed a duty to Jones not to subject him to an unreasonable risk of harm. *Tolbert,* supra at 443; *Sutter v. Hutchings,* 254 Ga. 194, 197 (327 SE2d 716); *Bradley Center v. Wessner,* 250 Ga. 199, 201 (296 SE2d 693). Appellant argues that ordinarily even if the nursing home was negligent, it would be insulated from liability by the intervention of the criminal act by a third party (Phillips) which is the proximate cause of the injury, for illegal acts by third parties are not reasonably foreseeable. *McClendon v. C & S Nat. Bank,* 155 Ga. App. 755, 756 (272 SE2d 592). This rule is inapplicable if a defendant had reasonable grounds for apprehending that such criminal act would be committed. *Bradley Center,* supra at 587; *Warner v. Arnold,* 133 Ga. App. 174, 176 (210 SE2d 350). And, as far as the scope of a defendant's duty is concerned, it makes no differ-

ence if the act of the intervening third party is negligent, intentional, or criminal, for even criminal conduct is often reasonably to be anticipated. 2 Harper & James, The Law of Torts 1144, § 20.5. The jury was authorized to find from the evidence of Phillips' involvement in prior altercations that Crestview knew or should have known of his propensity to resort to physical violence. Further the nursing home was subject to the double duty — (1) not to subject its residents to an unreasonable risk of harm, and (2) to supervise or otherwise manage lawfully any known resident who was prone to use assaultive behavior.

Whether appellants acted negligently in their care and supervision of their residents is a jury question. *Tolbert*, supra. The jury resolved the issue in favor of Jones, and the nursing home's claim of compliance with a legislative enactment will not prevent a finding of negligence where a reasonable person would have taken additional precautions. Restatement, Torts 2d, § 288C. There was sufficient evidence of knowledge of the aggressive resident, and neglect on the part of the nursing home, to authorize a jury to find that Crestview failed to properly supervise a known physically aggressive resident, and to exercise reasonable care to protect the other residents from harm. See *Donson Nursing Facilities v. Dixon*, 176 Ga. App. 700, 701 (337 SE2d 351). This enumeration is without merit.

2. Crestview alleges that appellee is not entitled to an award of punitive damages. We agree. OCGA § 51-12-5 authorizes an award of punitive damages where "there are aggravating circumstances, in either the act or the intention. . . ." "It is well established that that language means such damages 'cannot be imposed in any case unless there is wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.' " *Rossville Apts. Co. v. Britton*, 178 Ga. App. 194 (1) (342 SE2d 504); accord *Melton v. LaCalamito*, 158 Ga. App. 820 (2) (d) (282 SE2d 393); *Felton v. Mercer*, 149 Ga. App. 358, 361 (254 SE2d 398); *Bonds v. Powl*, 140 Ga. App. 140, 143 (230 SE2d 133). " 'The latter expression [conscious indifference to consequences] relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights.' " *Concrete Constr. Co. v. City of Atlanta*, 176 Ga. App. 873, 875 (339 SE2d 266); accord *Gilman Paper Co. v. James*, 235 Ga. 348, 351 (219 SE2d 447). " 'Mere negligence, although gross, will not alone authorize the recovery of punitive damages.' " *Alliance Transp. v. Mayer*, 165 Ga. App. 344, 345 (301 SE2d 290); *BLI Constr. Co. v. Debari*, 135 Ga. App. 299, 302 (217 SE2d 426). Ordinarily the imposition of punitive damages is an issue for the jury. However, the controlling criteria is whether there is any evidence to support such an award. *Dempsey Bros. Dairies v. Blalock*, 173 Ga. App. 7, 8 (325 SE2d 410). The proof offered in

the instant case does not measure up to the standard authorizing imposition of punitive damages. We have found no evidence of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. Accordingly, that portion of the judgment awarding punitive damages must be written off.

3. We find no error in receiving in evidence four photographs taken of Mr. Jones while in the hospital, as they tend to show the extent of his injuries inflicted by Phillips. Evidence which is relevant to an issue is admissible and is not subject to an objection it might inflame the minds of the jury, or prejudice the jury, " 'and this is true even where the offered evidence is only cumulative. . . .' " *Sprouse v. State*, 242 Ga. 831 (3) (252 SE2d 173); accord *Meeker v. State*, 249 Ga. 780 (1) (294 SE2d 479).

4. The charge of the court on the bases of recovery of damages was full and fair when considered in its entirety. We find no support for appellant's conclusion that one portion of the charge was confusing and was without evidence in the record to support the giving of the charge. The court's charge was couched in terms that the jury could take into consideration "any injury . . . any physical and mental distress and suffering which he endured . . . any sense of shame, humiliation, or anguish . . . if any." This charge was given in connection with "general damages" which our Code says "are those which the law presumes to flow from any tortious act; they may be recovered without proof of any amount." OCGA § 51-12-2. We find no error. See *County of Bibb v. Ham*, 110 Ga. 340, 341 (35 SE 656).

*Judgment affirmed on condition that the portion relating to award of punitive damages be stricken; otherwise, judgment reversed. Deen, P. J., and Pope, J., concur.*

DECIDED JANUARY 20, 1988 —
REHEARING DENIED FEBRUARY 12, 1988.

*Steven D. Harris, Nancy P. Phillips, Thomas S. Carlock, Allen F. Harris*, for appellant.

*James D. McGuire, Mark C. Harper, Montfort S. Ray*, for appellee.