A91A0217. MORALES et al. v. WEBB.
(409 SE2d 572)

SOGNIER, Chief Judge.

Mary Webb brought suit against Brian Arnold, M.D., an anesthesiologist, and his professional corporation; Cecilia Morales, a certified registered nurse anesthetist employed by the professional corporation; and M. Michael Pulliam, M.D., an ophthalmologist, and his professional corporation, alleging negligence in the performance of cataract surgery. The jury rendered a verdict in favor of Dr. Pulliam and his professional corporation, but awarded a verdict of $300,000 in compensatory damages and $700,000 in punitive damages against Dr. Arnold, Morales, and Dr. Arnold's professional corporation. The latter three defendants appeal from the denial of their motion for judgment n.o.v. on the punitive damages award.

It is undisputed that after cataract surgery was performed on appellee, she developed a swelling of the nerve fiber in the back of her eye, which led to a loss of vision. The cause of this occurrence, however, was hotly contested at trial, with the parties in complete disagreement on the critical question whether the anesthetic was depleted during the surgery and whether appellee became anesthetically "light" during the procedure. Evidence was adduced that appellee's surgery, during which a cataract was to be removed from her right eye and a new lens inserted, was the first procedure performed in the operating room of Newton General Hospital on June 11, 1987. Although such procedures ordinarily are performed under local anesthesia, appellee, a 66 year old woman, chose to have general anesthesia. Dr. Arnold objected to this decision because appellee's history of heart disease, high blood pressure and insulin dependent diabetes increased the risk of complications, but Dr. Pulliam, who as the surgeon had the final say, overruled him.

Morales, who was responsible for administering the anesthetic

agents during the surgery, also had the duty of setting up the anesthesia machine and equipment before the procedure began. Morales testified that she followed her usual pre-surgery procedures that morning, and specifically recalled checking the anesthesia machine canister to ensure that it contained a sufficient amount of Forane, the principal anesthetic agent. The chart she prepared to document her activities during the surgery stated that the "[anesthesia] machine [was] checked and working" prior to the start of the procedure. Dr. Arnold testified that for appellee's surgery he followed his usual practice of anesthetizing the patient, ensuring she was stable, and remaining in the operating room until just before the incision.

The hospital records revealed that anesthesia was begun at 7:55 a.m. Dr. Pulliam testified that at about 9:15 a.m., approximately 15 minutes after he began the surgery, as he was viewing appellee's eye through a microscope and preparing to insert the lens implant, he saw her eye move and felt her head rise slightly. Dr. Pulliam testified that he informed Morales that appellee was exhibiting signs of becoming anesthetically light, and that in response Morales said the problem had arisen because the Forane had run out. He testified that he then watched Morales refill a canister with an "aqua-greenish" liquid. Dr. Pulliam testified that he had to wait three to five minutes for appellee to become stabilized before he could resume the procedure, whereupon he ascertained that appellee had experienced a loss of vitreous and that the vitreous had extruded through the incision. As a result, he could not insert the lens but instead was compelled to perform a vitrectomy to correct the extrusion. Dr. Pulliam testified that after the surgery was completed, he immediately informed both Dr. Arnold and the hospital administrator of the episode.

Morales and Dr. Arnold acknowledged that allowing the Forane to run out or the patient to become light constituted breaches of the applicable standard of care, but they denied such events occurred. Morales testified that she fully carried out her duty to check and refill the ·Forane canister before the procedure, that appellee never moved or became light, and that the Forane did not run out during the procedure. Dr. Arnold testified that after he determined appellee was properly anesthetized, he then went to the next operating room to prepare another patient, but checked on appellee regularly and returned to the operating room at Morales's request to administer additional medication as needed. Both he and Morales testified that he spent more time in the operating room with appellee than was his usual practice, and he stated he did so because of his concerns about appellee's poor health. Dr. Arnold testified that despite his frequent presence in the room, he never saw appellee move or become light, and that no one ever informed him of such an incident. A bottle of a clear liquid Dr. Arnold identified as Forane was admitted into evi-

dence.

The hospital administrator testified that Dr. Pulliam did not mention the problem to him until months afterward. Of the other nurses in the operating room at the time of the procedure, one testified she was aware that appellee moved and became light, while two others denied seeing appellee become light. The hospital charts prepared to document the procedure did not indicate that the Forane supply ran out, but did reveal that appellee experienced blood pressure fluctuations during the surgery, including a rise in blood pressure around 9:15 a.m., and evidence was adduced that an increase in blood pressure could result either if the patient became light or from other causes. The charts also disclosed that certain medications had been administered by Morales and Dr. Arnold during the procedure, but the evidence concerning the purpose of those actions was disputed, with appellants contending the medications were given to maintain appellee's blood pressure and facilitate her use of the ventilator, and other experts opining that the drugs were used to stabilize appellee after she became light.

Conflicting expert testimony also was presented on the issue of the cause of appellee's vitreous extrusion and subsequent loss of vision. Evidence was adduced that vitreous extrusion, a known risk of cataract surgery, can occur as a result of various factors, one of which is a rise in intraocular pressure after incision. There was testimony that an increase in intraocular pressure can result from, inter alia, an increase in blood pressure, which could happen if the patient became light.

"Punitive damages 'are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.' [Cit.] In Georgia, when the tortious conduct amounts to 'wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences(,)' punitive damages are allowed pursuant to OCGA § 51-12-5 to deter the wrongdoer from repeating his wrongful acts. [Cits.] Punitive damages cannot be imposed without a finding of some form of culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award. [Cit.]" *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (3b) (365 SE2d 827) (1988). The issue of punitive damages is ordinarily for the jury, but appellate courts will intervene if there is no evidence to support such an award. *Assoc. Health Systems v. Jones*, 185 Ga. App. 798, 802 (2) (366 SE2d 147) (1988).

In the case at bar, there was evidence from which the jury could find that Dr. Arnold and Morales, his employee, negligently failed to maintain an adequate level of Forane and negligently failed to keep appellee properly anesthetized, and that this negligence was the prox-

imate cause of her subsequent vision loss. Proof of negligence, however, is not sufficient to sustain an award of punitive damages. *Colonial Pipeline*, supra. There was no evidence of "an intentional disregard of the rights" of appellee, nor was there any evidence that appellants "knowingly or wilfully disregarded such rights" so as to authorize a finding of conscious indifference to consequences. *Assoc. Health*, supra. Unlike the circumstance in *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173, 175 (2) (355 SE2d 104) (1987), cited by appellee and the dissent, in which the defendant's employees knew of the plaintiff's physical condition and medications history but failed to convey this information to the physician on call, here there was no evidence that appellants had *actual knowledge* of the shortage of Forane in advance of the operation, and thus no evidence of a *conscious* indifference to consequences. "While there may have been evidence from which the jury could find negligence, there was no evidence of an entire want of care on the part of [appellants] which would raise the presumption of a conscious indifference to consequences. [Cits.] Therefore, the trial court erred in refusing to direct a verdict in favor of [appellants] on the issue of punitive damages." *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 862 (1) (389 SE2d 355) (1989). See *Assoc. Health*, supra at 802-803. Accordingly, we reverse the trial court's denial of appellants' motion for judgment n.o.v. on the punitive damages claim.

*Judgment reversed. Birdsong, P. J., Carley and Andrews, JJ., concur. Beasley, J., concurs specially. McMurray, P. J., Banke, P. J., Pope and Cooper, JJ., dissent.*

BEASLEY, Judge, concurring specially.

I concur. There is a legal difference between even gross negligence, which will not support punitive damages, and conscious indifference to the consequences of one's behavior, which aggravating circumstance will support punitive damages. Considering all the evidence in favor of the verdict, there is no evidence that the conduct of defendants in this case crossed the line that stands between *compensable* negligence, even if it were found to be gross, and *punishable* conscious indifference. Cf. *Hoffman v. Wells*, 260 Ga. 588 (1, 3) (397 SE2d 696) (1990).

McMURRAY, Presiding Judge, dissenting.

The sole issue in this medical malpractice case is whether the evidence was sufficient to support an award of punitive damages. In my view, the evidence was sufficient. Accordingly, I respectfully dissent.

" 'OCGA § 51-12-5 permits a jury to award punitive (exemplary) damages "(i)n a tort action in which there are aggravating circumstances, in either the act or the intention . . ." It is well established

that that language means such damages "cannot be imposed in any case unless there is willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. (Cit.)" (Cit.)' *Rossville Apts. Co. v. Britton*, 178 Ga. App. 194 (1) (342 SE2d 504) (1986). ' " "The latter expression (conscious indifference to consequences) relates to an intentional disregard of the rights of another, knowingly or wilfully, disregarding such rights.' " (Cits.) " 'Mere negligence, although gross, will not alone authorize the recovery of punitive damages.' " (Cits.)' *Associated Health Systems v. Jones*, 185 Ga. App. 798, 802 (2) (366 SE2d 147) (1988)." *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 861 (389 SE2d 355).

" 'Ordinarily the imposition of punitive damages is an issue for the jury. However, the controlling criteria is whether there is any evidence to support such an award. (Cit.)' *Associated Health Systems*, supra at 802 (2)." *Petrolane Gas Svc. v. Eusery*, supra at 862.

In the case sub judice, the evidence of negligence and causation was conflicting. The jury was authorized, however, to glean the following facts: Plaintiff underwent cataract surgery on her right eye at the hands of the opthalmologist. She was the first case of the day.

General anesthesia was administered by the nurse anesthetist under the supervision of the anesthesiologist. The nurse anesthetist was an employee of the anesthesiologist's professional corporation.

One of the complications which can arise during eye surgery is vitreous extrusion. This can occur as a result of various factors, including a rise in intraocular pressure after incision.

A rise in intraocular pressure can accompany a rise in blood pressure. It can also occur when an eye surgery patient moves on the operating table. Thus, it is imperative for an eye surgery patient's blood pressure to remain in the lower ranges and for the patient to remain immobile once the eye has been opened surgically.

It was the responsibility of the anesthesiologist and the nurse anesthetist to insure that plaintiff's blood pressure remained stable and that plaintiff did not move during surgery. These goals were to be accomplished by the administration of anesthetic agents.

One of the anesthetic agents which plaintiff was administered during surgery was Forane. There was evidence that the nurse anesthetist neglected to check the level of Forane in the anesthesia machine before administering anesthesia to plaintiff.

After plaintiff was put to "sleep," the ophthalmologist made an incision in her right eye and removed the cataract. Just before the lens implant was to be inserted, plaintiff became anesthetically "light."

An expert testified that when a patient becomes "light" anesthetically, she undergoes an "emergence phenomenon" and shows "signs

of waking up." These signs include a quickening pulse, increased blood pressure, eye pressure elevation and movement.

When the patient became anesthetically "light," she suffered a loss of vitreous. At that point, it became necessary for the ophthalmologist to perform a vitrectomy and he could no longer insert the lens implant. Ultimately, plaintiff developed cystoid macula edema (a swelling of the nerve fiber in the back of the eye) due to vitreous extrusion. The result was a loss of vision in plaintiff's right eye.

There was expert testimony that plaintiff became anesthetically "light" because the anesthesia machine ran out of Forane in the midst of plaintiff's surgery. This would not have occurred if the anesthesia machine had been checked before plaintiff's surgery began.

The anesthesiologist admitted that the Forane should not have run out during plaintiff's surgery and that the failure to check the level of Forane in the anesthesia machine before plaintiff underwent surgery was a "complete violation of the standard of care." The ophthalmologist likened the failure to check the level of Forane before surgery to failing to check the level of gas before flying a private plane.

In *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173, 175 (2) (355 SE2d 104), this Court held that the failure of the hospital's nurses to convey knowledge of a patient's heart condition and medication to a physician "evinces that entire want of care which would raise the presumption of a conscious indifference to the consequences." Id. Accordingly, this Court found the evidence in that case to be sufficient to support the jury's award of punitive damages.

In my view, the jury was entitled to conclude that the failure to check the level of anesthesia before plaintiff underwent eye surgery also "evinces that entire want of care which would raise the presumption of a conscious indifference to the consequences." *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173, 175 (2), supra. It follows that the jury's award of punitive damages should stand.

I am authorized to state that Presiding Judge Banke, Judge Pope and Judge Cooper join in this dissent.

DECIDED JULY 16, 1991 —
RECONSIDERATION DENIED JULY 31, 1991 — 

*Love & Willingham, Daryll Love, Kimberly L. Woodland*, for appellants.

*Williams & Henry, Benjamin S. Williams, Sullivan, Hall, Booth & Smith, Rush S. Smith, Jr.*, for appellee.