A91A2148. JORDAN et al. v. CITY OF ROME et al.
(417 SE2d 730)

SOGNIER, Chief Judge.

Patricia Jordan and her husband, Cary Jordan, brought a negligence suit against the City of Rome, its chief of police, Joe Cleveland, and a police department radio dispatch officer, John Hellreigel, seeking damages incurred as a result of defendants' failure to dispatch a police vehicle to the Jordans' home in response to an emergency call.

The Jordans also alleged that defendants' negligent failure to respond was the result of improper training of radio dispatch officers. The trial court granted the defendants' motion for summary judgment on the basis that defendants did not breach any "special duty" owed to Patricia Jordan. The Jordans appeal.

In its order on summary judgment, the trial court expressly noted that no question or defense of governmental immunity was raised by appellees. This holding is not challenged by appellees in this court. Although it is not affirmatively reflected in the record, it appears that appellee City has waived appellees' immunity from liability for damages by the purchase of liability insurance that covered the City and its employees for acts of negligence committed in the scope of their duties. See OCGA §§ 36-33-1 (a), 36-33-3; *Adams v. Perdue*, 199 Ga. App. 476, 478 (405 SE2d 305) (1991) (municipality can waive governmental immunity to extent of liability insurance coverage). Thus, immunity is not an element in this appeal. Since the issue of the liability of a municipality and its officers for the actions of its police department was resolved in earlier opinions on the basis of the grant of governmental immunity, e.g., *Pounds v. Central of Ga. R.*, 142 Ga. 415 (83 SE 96) (1914), in the absence of such immunity we address the issue for the first time in Georgia.

Construing the evidence most strongly in favor of appellants as respondents on motion for summary judgment, see generally *Ingram v. JIK Realty Co.*, 199 Ga. App. 335, 336 (1) (404 SE2d 802) (1991), the record reveals that early in the morning of December 22, 1987, appellant Patricia Jordan (hereinafter Jordan) was at home with her children while appellant Cary Jordan was away. Hoyt Marks appeared at the door to the home and asked to speak with Dana Jordan Marks, his estranged wife and Cary Jordan's sister. Jordan deposed that she could tell from Marks' voice that he was drunk, and she did not allow him inside. Telling him to wait, she telephoned Dana, who instructed Jordan to let Marks inside, then call her back. Dana also told Jordan that she (Dana) would call the police, although there is a conflict in their deposition testimony whether Dana stated she would make the call before or after she talked to Marks. Jordan deposed that she did not ask Dana to call the police, did not know why Dana said she would call the police, and did not ask why Dana thought the police should be called. Instead, Jordan returned to the door and let Marks inside. Jordan stated she was not afraid of Marks at the time and had never been bothered by him. After Marks finished the phone call to Dana, he refused to leave the house. Marks turned on Jordan with a knife and sexually assaulted her. Jordan deposed that she did not fight Marks, that she warned Marks the police were coming, and that she "just knew [the police] were going to come and get him" during the assault. In a call from Dana that Marks allowed her to

answer during the assault, Jordan was able to respond negatively in response to Dana's question whether the police had arrived and was reassured by Dana that she would "call [the police] back" even though Jordan was unable to alert Dana to what was happening. After further assaulting Jordan, Marks left approximately an hour and a half after his arrival. It is uncontroverted that on the night in issue, no police officer ever went to appellants' home.

Dana deposed that she knew that Marks' presence at appellants' home meant that Marks had "escaped" from Northwest Regional Hospital where he was undergoing a program for alcohol abuse. She did not know if Marks was voluntarily involved in the program, but thought it was part of his probation as a habitual violator. She did not tell Jordan what she knew about Marks but deposed that after she spoke to Marks on the phone, she had her mother (and Jordan's mother-in-law) telephone the City of Rome police department. In Dana's presence, her mother told appellee Hellreigel, the person who answered the phone, that Marks was at appellants' home, that he was an escapee from Northwest Regional, and that there were "warrants on him . . . for probation revocation." Dana then took the phone and recognized Hellreigel's voice because she had previously met him. Dana deposed that she identified herself and repeated the information her mother had given. She telephoned the City of Rome police department two more times, repeating the same information to Hellreigel, and both times in response to her inquiry Hellreigel told her that a car was en route to appellants' home.

In support of their motion for summary judgment, appellees adduced a transcript of the only call reflected on the master tape recording of the relevant duty shift regarding appellants' address. The unidentified caller asked for a car to be sent to appellants' address to have Marks removed from the caller's son's house and twice stated that Marks was "harassing" the caller's daughter-in-law. The caller also stated that there were warrants out for Marks' arrest, but did not state that Marks had escaped from Northwest Regional Hospital. The caller asked to speak to a particular officer and was placed on hold by Hellreigel, with the final comment on the tape transcript being Hellreigel's order to the requested officer to talk to the caller on another phone line. In his affidavit Hellreigel averred that after transferring the call to the other phone line, he became busy handling calls stemming out of a shooting in Rome and took no further action on the matter, assuming that the requested officer had handled the caller's problems.

1. The trial court based its ruling in favor of appellees on a line of foreign authorities, exemplified by *Kircher v. City of Jamestown*, 543 NE2d 443 (N.Y. 1989), which holds that although a municipality owes a "general duty" to protect the public at large, a breach of that duty

does not impose liability for damages suffered by particular citizens except where there exists a special relationship between the police and that individual, whereby the police assumed a "special duty" to provide police protection to that particular individual. See 18 McQuillin, The Law of Municipal Corporations, § 53.04 (b), (c) and (e) (3d ed.). To determine whether a special duty existed, the courts look especially at whether there was "direct contact" between the police and the crime victim and an affirmative undertaking by the municipality to act on the victim's behalf on which the victim justifiably relied to his or her detriment. See *Cuffy v. City of New York*, 505 NE2d 937, 940 (N.Y. 1987).[1] A review of learned treatises and the cases cited by appellees reveals that the general duty/special duty analysis "developed to some extent from a commendable willingness of the courts to expand liability, in days when immunity was general, to egregious cases of failure to protect informers and other witnesses to whom protection had been promised . . . ." 5 Harper, James & Gray, The Law of Torts, § 29.6A, pp. 641-642 (2d ed.). See *Cuffy*, supra at 939-940; see also cases cited in Annot., 38 ALR4th 1194 (1985). While a majority of jurisdictions has allowed plaintiffs to pierce a governmental entity's immunity defense by applying the special duty analysis, a growing minority of jurisdictions has rejected or abandoned the general duty/special duty analysis where sovereign immunity has been abrogated or waived. E.g., *Ryan v. State of Arizona*, 656 P2d 597 (Ariz. 1982), superseded by statute as stated in *Bird v. State*, 821 P2d 287 (Ariz. App. 1991); *Leake v. Cain*, 720 P2d 152 (Colo. 1986). The primary reason for this change is that where sovereign immunity does not apply, use of the special duty analysis creates a shield behind which governmental entities can avoid liability for negligent acts, thereby imposing a type of immunity unique to governmental defendants. See McQuillin, supra at § 53.04 (b), pp. 166-167; Harper, James & Gray, supra at 640.

Given the constitutional and statutory language in Georgia waiving governmental immunity to the extent of applicable liability insurance coverage, we find that the principle behind the general duty/special duty analysis as set forth in the foreign jurisdictions cited by the trial court and appellees is not applicable in Georgia and affords

---

[1] *Kircher*, supra, the case cited by the trial court, typifies the application of the special duty analysis. In that case, witnesses observed the plaintiff being forced into a car. The witnesses followed the car but, coming upon a police officer, stopped to inform him of the suspected crime. The officer, although given the tag number of the car, failed to report the incident. The plaintiff was driven to a distant location, beaten and raped, then locked in the car's trunk, from which she was rescued 12 hours later. The *Kircher* court held that the plaintiff could not pierce the governmental defendants' immunity because, under the special duty analysis, "by virtue of her unfortunate circumstances, [she] could not communicate with the police and thus obviously could not rely on their assurances of assistance." Id. at 446.

no basis for the trial court's grant of summary judgment in favor of appellees.

2. Where sovereign immunity is waived or inapplicable, it is well established that suits against governmental entities are governed by the same general principles of tort law that apply to private entities. See, e.g., *City Council of Augusta v. Mackey*, 113 Ga. 64, 69 (38 SE 339) (1901) (city liable for negligent act "in the same manner and to the same extent that a private person would be.") It would seem that the general principle of tort law applicable here is the long established rule that private entities owe no duty to members of the general public to control the behavior of third parties or protect those endangered by the criminal conduct of third parties. *Bradley Center v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982).[2] When applied to private entities that exist to provide private medical treatment or fine dining or vacation accommodations, the rationale behind the rule is apparent. However, when the very existence of the entity in issue is predicated upon the exercise of police powers, such as the protection of individuals from the criminal acts of third parties, the rationale behind the rule falters.

A municipality assumes the protection of persons within its boundaries as an inherent power of government which is granted by the people to its municipal agents. See *DeBerry v. City of LaGrange*, 62 Ga. App. 74, 77-78 (8 SE2d 146) (1940). The charter that created the City of Rome as a legal entity explicitly places upon the City, its chief of police, and its police officers the duty "to preserve the peace, protect life and property, [and] prevent as far as possible the violations of the ordinances of [the City] and the laws of [Georgia]." Ga. L. 1918, pp. 813, 869, §§ 97, 98. Unlike the treatment center in *Bradley Center* or the Chinese restaurant in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), the City of Rome exists in part to protect its citizens from the criminal acts of third parties. Because of this basic distinction between municipal police departments and private parties, we do not find the rule set forth in *Bradley Center*, supra, applicable to appellees in the case sub judice.

We hold that no question exists that the City owes the persons within its municipal boundaries a duty to exercise ordinary care to protect them against the intentional and often unpredictable criminal acts of third parties. We further hold, however, that the undertaking of this affirmative duty does not render the City or any municipal

---

[2] See also *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991) (Chinese restaurant not liable for robbery of patrons in parking lot); *Adler's Package Shop v. Parker*, 190 Ga. App. 68 (378 SE2d 323) (1989) (liquor store not liable for criminal assault on shopper leaving store); *Washington Road Properties v. Stark*, 178 Ga. App. 180 (342 SE2d 327) (1986) (hotel not liable for rape and robbery of patrons).

corporation an insurer of the safety of every person within its boundaries or subject it to "wholesale liability in negligence to all crime victims on generalized charges of insufficiency of care in law enforcement." Harper, James & Gray, supra at 640-641. Rather, we hold that where a foreseeable risk of harm develops that is not caused by or created by the municipality, its duty to exercise ordinary care to protect an individual within its boundaries from the intentional and unpredictable criminal acts of third parties arises only when it reasonably knew or should have known that its acts or omissions exposed an individual to the risk.

Our holding is consistent with Georgia law that "[n]egligence consists of exposing another to whom one owes a duty . . . to a foreseeable unreasonable probability of harm. Reasonable foresight does not require of a [party] that he anticipate exactly what will happen and exercise perfect judgment to prevent injury. 'Not what actually happened, but what the reasonably prudent person would then have foreseen as likely to happen, is the key to the question of reasonableness.' [Cit.] 'Negligence is predicated on faulty or defective foresight rather than on hindsight which reveals a mistake.' [Cits.]" *Ellington v. Tolar Constr.*, 237 Ga. 235, 238 (227 SE2d 336) (1976). "A party is required only to foresee and guard against that which can be reasonably anticipated to happen, not against that which is only remotely and slightly possible. [Cit.]" *Savannah Bank &c. Co. v. Weiner*, 193 Ga. App. 616, 617 (1) (388 SE2d 725) (1989). We note that our holding is consistent with statutory law in which the Legislature, while allowing the general public to bring negligence suits against municipalities for defects in the public roads of the municipality's streets, has relieved the municipality from any and all liability for those defects except, inter alia, where the municipality negligently created the defect or where it has "actual notice" of the defect. See OCGA § 32-4-93 (a); *Andrews v. City of Macon*, 191 Ga. App. 745, 746-747 (2) (382 SE2d 739) (1989).

Although the question whether a duty exists is for the court, *First Fed. &c. Bank of Brunswick v. Fretthold*, 195 Ga. App. 482, 485-486 (394 SE2d 128) (1990), questions of negligence, diligence, and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them except in plain and indisputable cases. *Storer Communications v. Burns*, 195 Ga. App. 230 (393 SE2d 92) (1990). "The Summary Judgment Act does not authorize the trial court to sit as both judge and jury, weighing the evidence and deciding issues that are traditionally for the jury. The sole function of the court on a motion for summary judgment is, rather, to determine whether there exists a genuine issue of material fact." (Citations and punctuation omitted.) *Collins v. Newman Machine Co.*, 190 Ga. App. 879, 884 (380 SE2d 314) (1989). In determin-

ing whether appellees knew or should have known that Jordan was in need of protection and thus breached their duty to exercise ordinary care to provide that protection, the evidence in the record presents clear and unavoidable fact disputes on the questions whether the City and the chief of police, through Hellreigel, received notice; whether, if notice was received, it was sufficient to alert them that a situation existed requiring them to fulfill their duty to exercise ordinary care to protect Jordan; and whether, assuming notice was received, they then reacted appropriately (e.g., whether it was appropriate to wait for some confirmation from Jordan before dispatching a police car, whether the response was within the capabilities of the City's resources, etc.).

Appellees also argue that even if there was a duty to exercise ordinary care to protect Jordan, summary judgment was nevertheless properly granted in their favor because it was Marks' intervening criminal act, not their failure to exercise ordinary care that was the proximate cause of appellants' injuries. We do not agree with appellees that *as a matter of law*, appellees could not reasonably have anticipated that the probable and natural consequence of a breach of their duty to exercise ordinary care to protect an individual against the intentional acts of a third party would be a criminal assault on the individual by the third party. See *Bradley Center*, supra at 202-203. Rather, in the circumstances of this case we hold that the question of reasonable foreseeability, like the question of breach of duty, is for a jury's determination rather than summary adjudication by the court. *Bishop v. Mangal Bhai Enterprises*, 194 Ga. App. 874, 878 (392 SE2d 535) (1990).

3. Based on its ruling that appellees breached no special duty to appellants, the trial court also granted summary judgment to appellees on the other allegation in appellants' complaint that the injuries they incurred when appellees failed to respond to the emergency call were the result of appellees' negligent and improper training of the police department's radio dispatch officers. Although the basis for that ruling was erroneous, see Divisions 1 and 2, supra, it is well established that a judgment that is right for any reason will be upheld. See generally *Precise v. City of Rossville*, 261 Ga. 210, 211 (3) (403 SE2d 47) (1991). We find that the entry of summary judgment on this part of appellants' complaint was proper on another basis.

In support of their motion for summary judgment, appellees submitted the affidavit of appellee Hellreigel, in which he set forth that he was trained by a seasoned dispatcher on the methods of gathering information over the phone, dispatching vehicles, and other matters required to perform his job. Appellees also presented the affidavit of the senior radio dispatcher who was working with Hellreigel who detailed his training and methods followed by the radio dispatch officers

on watch during the incident in question. Appellants adduced no evidence to rebut these affiants' statements about the training they received or otherwise create a genuine issue of fact whether the training that the radio dispatch officers received was not sufficient to enable them to perform their jobs. "Once the moving party for summary judgment has carried its burden of making out a prima facie case, the burden shifts and the opposite party must come forward with rebuttal evidence or suffer judgment against him. [Cits.]" *Bright v. Knecht*, 182 Ga. App. 820, 821 (357 SE2d 159) (1987). Thus, although the record presents a question of fact whether Hellreigel failed to perform his duties properly in handling the calls allegedly made by Dana Jordan Marks and Jordan's mother-in-law, there is no dispute in the evidence regarding the overall training of radio dispatch officers employed by the City. Therefore, appellees were entitled to the grant of partial summary judgment on this allegation. OCGA § 9-11-56 (c).

*Judgment affirmed in part and reversed in part. McMurray, P. J., Carley, P. J., and Cooper, J., concur. Beasley, J., concurs specially. Birdsong, P. J., Pope, Andrews and Johnson, JJ., dissent.*

BEASLEY, Judge, concurring specially.

1. I concur in the first two divisions but not in all that is written in them. Sovereign immunity is a defense rather than an inroad on one of the elements of a tort. Since it is not invoked here, the first question is whether the defendants owed a legal duty to plaintiffs.

The 1983 Constitution of Georgia provides the foundation for such a duty in its second paragraph: "Protection to person and property is the paramount duty of government and shall be impartial and complete." Art. I, Sec. I, Par. II. Whether a duty to Patricia Jordan arose from the circumstances conveyed to the police, considering all reasonable inferences to be drawn therefrom, is a jury question. *Storer Communications v. Burns*, 195 Ga. App. 230 (393 SE2d 92) (1990).

One of the reasonable inferences which could be drawn is that one of the two callers would or did notify appellant that the police were on the way, which would support a finding that the dispatch officer should have known that his assurances would be relied on. There is direct testimony that they were relied on by Patricia Jordan in her actions and inactions with respect to the assailant.

A reasonable inference could also be drawn that harm to plaintiff was reasonably foreseeable, given the information conveyed to the dispatcher, if a police officer was not sent as advised. *Ellington v. Tolar Constr.*, 237 Ga. 235, 238 (227 SE2d 336) (1976); *Savannah Bank &c. Co. v. Weiner*, 193 Ga. App. 616, 617 (1) (388 SE2d 725) (1989); *Bishop v. Mangal Bhai Enterprises*, 194 Ga. App. 874, 878 (392 SE2d 535) (1990).

If a duty was owed and breached, then the issues of proximate cause and injury would have to be reached. As to them, the evidence is in dispute.

2. I fully concur in Division 3.

ANDREWS, Judge, dissenting.

I respectfully dissent. The defendants violated no duty for which they could be held liable in tort, therefore, the trial court correctly granted summary judgment.

The majority refers to a line of cases from other jurisdictions discussing what has been labeled the "public duty doctrine" dealing with governmental liability for torts in the absence of immunity (see Annot. 38 ALR4th 1194 (1985)), and concludes the trial court incorrectly applied this analysis to limit the scope of the defendants' duty by creating, in effect, a limited immunity similar to sovereign immunity to which the defendants were not entitled.[1] It is unnecessary to decide whether the "public duty doctrine," or any other limitation on governmental tort liability may apply in the absence of sovereign immunity in this case. From an analytical perspective, the threshold issue is whether the defendants had any duty under traditional tort principles to protect Jordan from Marks' attack. The traditional tort duty issue necessarily precedes any discussion of governmental immunity or other limits on tort liability under any theory, since a defendant must first be potentially liable for the breach of a legal duty to conform to a standard of conduct before there is any need to invoke a form of immunity from the breach. See *Galati v. Town of Longboat Key*, 562 S2d 780, 781 (Fla. App. 2 Dist. 1990); *Williams v. State*, 664 P2d 137, 139 (Cal. 1983) (immunity issues do not arise until it is determined that a governmental entity owes a duty of care to the plaintiff). I disagree with the majority's conclusion that by requiring a special relationship between the plaintiff and the defendants in order to trigger a legal duty, this granted the defendants a type of immunity applied only to governmental entities to give them more favorable treatment than private entities would receive under traditional tort analysis. To the contrary, to establish the threshold tort element of duty based

---

[1] The public duty doctrine, and its special duty exception, has been accepted in the majority of jurisdictions which have considered it. See *Sawicki v. Village of Ottawa Hills*, 525 NE2d 468, 477 (Ohio 1988); *Leake v. Cain*, 720 P2d 152, 158 (Colo. 1986). The doctrine has been applied where an individual sues a governmental entity for breach of a duty owed to the general public such as the duty to protect the public from criminal acts. Generally, in the absence of a "special relationship" between the plaintiff and the governmental entity, the doctrine provides that there is no breach of duty upon which tort liability can be based. The special duty exception provides that a duty upon which tort liability may be established is recognized only if the duty of due care breached was a special duty, one owed to the plaintiff because of a special relationship established with that individual, rather than a duty owed to the public in general.

solely on a general duty to the public has the effect of expanding the defendants' duty beyond that applicable under traditional tort law. Under the present allegations of police nonfeasance, traditional tort principles apply to establish that the defendants breached no duty for which they could be held liable.

"To state a cause of action for negligence in Georgia, the following elements are essential: (1) [a] legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982) (punctuation and citation omitted). "Generally, a person does not have a duty to control the conduct of another person, who is a potential tortfeasor, so as to prevent that person from harming a third person, unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Associated Health Systems v. Jones*, 185 Ga. App. 798, 801 (366 SE2d 147) (1988) (punctuation and citations omitted); *Bradley Center*, supra at 201; Restatement, Law of Torts 2d, § 315. Similarly, "a person is under no duty to rescue another from a situation of peril which the former has not caused." *Alexander v. Harnick*, 142 Ga. App. 816, 817 (237 SE2d 221) (1977). Even where one having no initial duty undertakes to come to another's aid the actor must exercise due care in performing, and is liable only if the failure to exercise due care increases the risk of harm, or harm is suffered because of the other's reliance on the undertaking. Restatement, Law of Torts 2d, § 323; see *Lau's Corp. v. Haskins*, 261 Ga. 491, 495, n. 2 (405 SE2d 474) (1991).

I know of no reason these general tort principles should not apply to police officers. "A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large." *Warren v. District of Columbia*, 444 A2d 1, 8 (D. C. App. 1981); *Lehto v. City of Oxnard*, 217 Cal. Rptr. 450, 455 (Cal. App. 2d Dist. 1985). Only where a special relationship exists between the parties, such as that between an officer and the prisoner in his custody, may social policy justify imposing a legal duty to assist or rescue another in danger. *Thomas v. Williams*, 105 Ga. App. 321, 326 (124 SE2d 409) (1962). Thus, in the context of a tort claim that the city's police negligently failed to furnish police protection to Jordan, the

application of a duty limited in scope by the type of relationship between the claimant and the city police is a traditional tort law concept applicable to both government and private entities. Application of a generalized duty of the defendants to protect persons within the city's boundaries, found by the majority to be inherent in the power of government, expands the defendants' duty and potential liability beyond that imposed under traditional tort analysis. "[W]hen negligence began to take form as a separate basis of tort liability, the courts developed the idea of duty, as a matter of some *specific relation* between the plaintiff and the defendant, without which there could be no liability." (Emphasis supplied.) Prosser & Keeton On Torts, § 53, pp. 356, 357 (5th ed. 1984). The trial court granted summary judgment in favor of the defendants on the basis that they violated no duty since no special relationship was demonstrated with Jordan. Although making reference to the public duty line of cases, the trial court's order was consistent with the application of traditional tort principles in an equal manner to the defendants. This is not a form of limited governmental immunity. When the government's responsibility for alleged negligence is limited by the scope of its duty, the "immunity" which results is not premised on the sovereign immunity maxim "the king can do no wrong," but on the tort principle that the king is not liable for the wrong done.

The tort claim made here for failure of the city police to protect Jordan from the criminal acts of another must be based, not on the general duty of the government to provide police protection to the public, but upon a special relationship that exists between the claimant and the governmental entity. In determining whether such a special relationship exists under these circumstances, the test applied in *Cuffy v. City of New York*, 505 NE2d 937, 940 (N.Y. 1987) provides a rational approach: "(1) an assumption by the municipality, through promises or actions of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." Id. at 940. Assuming without deciding that there was some form of direct contact between the police and Jordan, and that the city's officers assumed an affirmative duty to act on her behalf by promising to send a car, there is an absence of evidence in support of the remaining elements necessary to find a special relationship. Jordan let Marks in because she perceived no danger at the time even though her sister-in-law stated that she would call the police. In the subsequent phone call, police told Jordan's sister-in-law that a car would be sent. In a later telephone call to Jordan while Marks was still present, Jordan was unable to inform her sister-in-law of the at-

tack, and answered in response to a question that the police had not arrived. Under these facts, I find no evidence that the harm resulted from any reliance Jordan placed on the statement police made to her sister-in-law that a car would be sent. There is no evidence that she forwent the possibility of help from other sources, or that she otherwise relaxed her own defenses. Based on the sparse information imparted to the police by phone, there is no basis to find that the police had knowledge that the failure to send a car could lead to the harm incurred. There is no evidence that the police inaction made the situation worse or increased the danger to Jordan.

Under the majority's analysis, the jury may well conclude that the police inaction did not proximately cause the harm. However, the threshold issue of duty is a question of law for the court. *First Fed. &c. Bank of Brunswick v. Fretthold*, 195 Ga. App. 482, 485-486 (394 SE2d 128) (1990). There being no basis upon which to find a special relationship under the facts, the trial court correctly concluded under traditional tort analysis that the defendants violated no duty, and properly granted summary judgment.

I am authorized to state that Presiding Judge Birdsong, Judge Pope and Judge Johnson join in this dissent.

DECIDED MARCH 20, 1992 —
RECONSIDERATION DENIED APRIL 2, 1992 — 

*Robins, Kaplan, Miller & Ciresi, Daniel A. Ragland, William H. Stanhope*, for appellants.
*Brinson, Askew & Berry, Robert M. Brinson, J. Anderson Davis, Robert N. Farrar*, for appellees.